## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 14 2017, 9:18 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Elizabeth A. Bellin | Curtis T. Hill, Jr. |
| Elkhart, Indiana | Attorney General of Indiana |
| | |
| | Tyler G. Banks |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Eduardo Deltoro, | June 14, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 20A05-1608-CR-1868 |
| v. | Appeal from the Elkhart Superior Court |
| State of Indiana, | The Honorable Teresa L. Cataldo, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 20D03-1508-F3-27 |

**Vaidik, Chief Judge.**

# Case Summary

Eduardo Deltoro appeals his convictions for possession of methamphetamine, unlawful possession of a firearm by a serious violent felon, and carrying a handgun without a license. He contends that the evidence is insufficient to support these convictions. Deltoro further argues that the trial court committed fundamental error by failing to declare a mistrial after the State asked a police officer a question that led to testimony about Deltoro's criminal history. Finding sufficient evidence and no fundamental error, we affirm.

# Facts and Procedural History

On the morning of August 12, 2015, Elizabeth Keenoy was taking her children to school in Goshen. She turned onto Wilden Avenue and saw what appeared to be an oncoming car that had lost control—swerving back and forth across all lanes of traffic, including oncoming traffic. That car ended up crashing along the bike path on the opposite side of the road from which it was traveling. Keenoy pulled over to the side of the road and called 911 to report the accident. Keenoy's fifteen-year-old son saw the driver, who was later identified as Deltoro, get out of the car. He observed that Deltoro was a dark-skinned male wearing a black t-shirt and orange shorts.

When firefighters arrived at the scene of the crash, Deltoro was not at the car. Keenoy approached Firefighter Jonathan Yoder and told him that she had seen the driver of the car walking down the bike path. She gave a description of

Deltoro, including that he was wearing orange shorts, and said that he started walking faster when the firetruck approached the crash site. Yoder was able to see Deltoro, approximately 150 yards away, walking along the bike path away from the crash. He then saw Deltoro "bolt" into a subdivision "as soon as the police car came around the curve[.]" Tr. Vol. III pp. 165-66. Yoder relayed this information to Sergeant Stuart Smith with the Goshen Police Department, who had arrived on the scene to investigate the crash. Based on Yoder's statement, Sergeant Smith requested back-up and told the responding officers to be looking for an individual that matched Deltoro's description.

[4] Sergeant Smith stayed at the scene of the crash and processed the car to be impounded. He found a digital scale inside the glove compartment and a single nine-millimeter bullet on the floorboard behind the driver's seat. Sergeant Smith was unable to locate the keys to the car. He then retraced the path the car had taken, following tire marks in the roadway and property damage along both sides of the road. "It left the road on both sides of the road hitting mailboxes, a couple of small trees, a concrete mailbox weight . . . or base, before coming to rest on the bike path." *Id.* at 192.

[5] Captain Keith Miller was one of the officers who responded to Sergeant Smith's request for back-up. Captain Miller began searching the subdivision that Deltoro was seen "bolting" into. Captain Miller saw Deltoro calmly walking down one of the streets and initially drove past him. As he passed Deltoro, Captain Miller looked in his rearview mirror and saw Deltoro "suddenly sprinting into a driveway[.]" *Id.* at 238. Captain Miller recognized Deltoro

from his clothing, turned his squad car around, and stopped Deltoro, who was calmly walking out of the driveway. He asked Deltoro for photo identification, but Deltoro was unable to provide any; he told Captain Miller that he had his information memorized so he did not carry any on him. Captain Miller entered Deltoro's information into his computer and received a report from the Bureau of Motor Vehicles that Deltoro had never been issued a driver's license. During this exchange of information, Captain Miller observed that Deltoro was wearing flip flops and had wet blades of grass stuck to the tops of his feet.

[6] Confident that there was sufficient probable cause to arrest Deltoro for driving the crashed car without a license, Captain Miller instructed Deltoro to empty the contents of his pockets onto the hood of the squad car. Deltoro produced a keyring with four keys on it, a loaded magazine for a nine-millimeter handgun, and various other items. Deltoro was taken into custody and placed in the back of a squad car. Worried that Deltoro had dropped a handgun somewhere between the crash site and where he was detained, Captain Miller requested K-9 officers to come to his location. While waiting on the K-9 unit, Captain Miller took the keys that Deltoro had produced to Sergeant Smith; the keys started the crashed car.

[7] Officer Mark Clere responded to Captain Miller's request for a K-9 unit. Officer Clere and his K-9 partner searched the driveway Deltoro had run into when he saw Captain Miller, and they found two bags of methamphetamine in the grass along the driveway. The net weight of both bags of methamphetamine was 50.04 grams.

[8] Still searching for the handgun, Officer Clere and his K-9 proceeded to the crash site and retraced Deltoro's path from the crash to where Deltoro was detained by Captain Miller. Captain Miller explained that no one had been along the bike path "so there's a good chance the dogs would be able to track [Deltoro's] scent." Tr. Vol. IV p. 10. Officer Clere and his K-9 began tracking Deltoro's scent, walking along the bike path and through yards. They found a nine-millimeter handgun that had been discarded in the grass, next to an electrical box. The gun was missing its magazine but had a single bullet loaded in the chamber. Captain Miller was called to the location of the handgun; he brought with him the magazine from Deltoro's pocket and inserted it into the handgun. It locked in place. According to Captain Miller, "It would appear it's the same magazine, the proper magazine for this firearm." *Id.* at 36.

[9] Deltoro was arrested and taken to jail. While waiting to be booked, he placed a phone call to an unknown woman. The conversation varied between English and Spanish throughout the call:

> Deltoro: "Okay. Hopefully everything goes great. They can't put that sh*t on me today. They didn't find it on me. They found it (indiscernible), but they didn't . . ."
>
> Woman: "*Outside?*"
>
> Deltoro: "*Yeah. Outside the car. I ran; I ran, and I threw everything. Boom. Boom. Boom. Boom.*"
>
> Woman: "*What? Outside in the grass?*"

| Deltoro: | "*Yes.*" |
|---|---|
| Woman: | "*Okay.*" |
| Deltoro: | "*Yeah, so everything was on the ground. Try to get me an attorney.*" |

Ex. 114a (portion of conversation spoken in Spanish in italics); *see* Tr. Vol. IV pp. 234-38 (translation of conversation from Spanish to English). The State charged Deltoro with Level 3 felony possession of twenty-eight or more grams of methamphetamine; Level 4 felony unlawful possession of a firearm by a serious violent felon ("SVF charge"); Class A misdemeanor carrying a handgun without a license; Class A misdemeanor operating a motor vehicle while never licensed (enhanced from a Class C misdemeanor due to an earlier conviction for the same offense); and Class B misdemeanor leaving the scene of an accident.

[10] A bifurcated jury trial was held. During phase one, the State was not allowed to mention Deltoro's criminal history, including his prior conviction for operating a vehicle while never licensed or his 2006 burglary conviction underlying the SVF charge. In phase one, the State called Officer Stephen Priem, one of the responding officers, to testify:

| State: | And again, at this point, he was under arrest? |
|---|---|
| Priem: | I was told by my supervisor that he was being charged with a crime and he was under arrest. |

State:          Did you book him into the jail under a certain crime or for a certain crime?

Priem:          I believe it was Operating While Intoxicated, Endangering, Possession of a Firearm by a Violent Felon, Driving Without a License - -

Tr. Vol. IV pp. 118-19.  Defense counsel objected, and the following bench conference ensued:

Defense:        I would move to strike the issue as it related to the violent felon aspect.  I didn't anticipate that was going to come up in his --

Court:          Do you want to say that to the jury?

Defense:        I just would like to object to that part of it at this point.

Court:          Okay. I will sustain your objection, but what do you want to do?

Defense:        What's that?

Court:          What do you want to do now that...

Defense:        Well, I suppose they would have to disregard --

Court:          Do you want me to just have them disregard the entire --

Defense:    Testimony as it relates to what he was [indiscernible].

Court:    Yeah.

State:    I have no objection to striking that - -

Court:    Okay.

State:    - - response.

*Id.* at 119-20.  The trial court admonished the jury to "disregard the response about what the defendant was booked into the jail for." *Id.*  Deltoro's criminal history was never mentioned again during phase one of the trial.

[11]  The jury returned guilty verdicts on all counts tried during phase one— possession of methamphetamine, carrying a handgun without a license, operating a vehicle while never licensed, and leaving the scene of an accident. The court immediately began phase two of the trial, and the State introduced evidence of Deltoro's criminal history, including certified copies of his prior convictions for operating a vehicle while never licensed and burglary.  *See* Exs. 201-205.  The jury found Deltoro guilty of unlawful possession of a firearm by a serious violent felon and the enhanced crime of operating a vehicle while never licensed with a prior conviction for the same offense.  Deltoro was sentenced to an aggregate term of twenty years, with fifteen years to be executed in the Department of Correction and five years suspended to probation.

[12] Deltoro appeals.

# Discussion and Decision

[13] Deltoro argues that the evidence presented at trial is insufficient to support three of his convictions. He also contends that the State engaged in prosecutorial misconduct when it questioned Officer Priem about Deltoro's booking charges during phase one of the trial.

# I. Sufficiency of the Evidence

[14] Deltoro argues that the evidence is insufficient to support his convictions for possession of methamphetamine, carrying a handgun without a license, and unlawful possession of a firearm by a serious violent felon. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine the credibility of witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). The evidence is sufficient "if an inference may reasonably be drawn from it to support the conviction." *Id.*

[15] Deltoro argues that the State failed to prove that he ever possessed or carried the methamphetamine or the handgun since they were found in the grass and not on his person. The State presented multiple witnesses who saw the driver of the crashed car leave the scene of the crash wearing a black t-shirt and orange shorts. Firefighter Yoder saw the driver "bolt" into a subdivision as police approached the scene of the crash. Captain Miller then saw a man who matched the description of the driver walking through the subdivision and saw that same man "sprint" into a driveway after Captain Miller drove past him. The man was then seen calmly walking out of the driveway, where Captain Miller detained him. The man was identified as Deltoro. Captain Miller had Deltoro empty his pockets onto the hood of his squad car. One of the items was a loaded magazine for a nine-millimeter handgun. Captain Miller called for a K-9 search team and Officer Clere responded. Officer Clere and his K-9 searched the area along the driveway that Deltoro had run into and found two bags of methamphetamine. Officer Clere and his K-9 then tracked Deltoro's movements from the crash site to where he was detained and found a nine-millimeter handgun hidden in the grass by an electrical box. The gun was missing its magazine, and Captain Miller was later able to confirm that the magazine found on Deltoro fit the handgun.

[16] In addition to the physical evidence recovered by police, Deltoro made a phone call from the jail. During the call he stated, "They didn't find it on me. . . . I ran; I ran and I threw everything. . . . Yeah, so everything was on the ground." Ex. 114(a); Tr. Vol. IV pp. 234-38. When asked if he threw everything outside

of the car into the grass, Deltoro answered "Yes." *Id.* We conclude that the evidence is sufficient to support Deltoro's convictions for all three of the challenged offenses.[1] *See Ferguson v. State*, 485 N.E. 888 (Ind. 1985) (upholding conviction for possession of heroin found on hotel basement floor because defendant's clothing matched the description of suspect's clothing and defendant fled through basement when he saw police).

## II. Prosecutorial Misconduct

Next, Deltoro argues that the State's question to Officer Priem regarding the charges for which Deltoro was booked into the jail amounted to prosecutorial misconduct. When reviewing a claim for prosecutorial misconduct that has been properly preserved, we determine "(1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). To preserve properly a claim of prosecutorial misconduct, the defense must, at the time of the alleged misconduct, raise a contemporaneous objection and request an admonishment; if the admonishment is not given or is insufficient to cure the error, the defense must request a mistrial. *Thomas v. State*, 9 N.E.3d 737, 742 (Ind. Ct. App. 2014). Failure to preserve a claim of

---

[1] Deltoro also contends that the State had to prove that he constructively possessed the firearm and methamphetamine because they were not found on his person. Having concluded there was sufficient evidence to establish actual possession, we do not address this argument.

prosecutorial misconduct results in waiver of the issue on appeal. *Ryan*, 9 N.E.3d at 667.

[18] In Deltoro's case, he objected to Officer Priem's testimony, and the trial judge admonished the jury. On appeal, he contends that the admonishment was insufficient and that the trial court should have declared a mistrial. Appellant's Br. p. 21. But Deltoro did not ask the trial court for a mistrial. Deltoro concedes that he has not properly preserved his prosecutorial-misconduct claim. *Id.* at 20. To be successful on appeal Deltoro must establish the grounds for prosecutorial misconduct **and** that the alleged misconduct was so prejudicial that the trial court committed fundamental error by failing to sua sponte declare a mistrial. *Ryan*, 9 N.E.3d at 667-68.

[19] Fundamental error is "an extremely narrow exception" to the waiver rule. *Id.* at 668. "[T]he defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Id.* (internal quotations omitted). Stated another way, to prevail under our fundamental-error analysis, the defendant must show that "under the circumstances the trial judge erred in not *sua sponte* raising the issue because [the] alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm." *Id.* (internal quotations omitted). We review the alleged misconduct and all relevant information given to the jury to determine whether the alleged misconduct "had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." *Id.*

[20]    Deltoro contends that the State engaged in prosecutorial misconduct when it questioned Officer Priem. The trial court bifurcated Deltoro's trial, and the State was not allowed to mention Deltoro's criminal history during phase one. During phase one, the State asked Officer Priem, "Did you book him into the jail under a certain crime or for a certain crime?" Tr. Vol. IV p. 118. Officer Priem answered with a list of the charges that Deltoro was booked under: "I believe it was Operating While Intoxicated, Endangering, Possession of a Firearm by a Violent Felon, Driving Without a License[.]" *Id.* at 118-19. Deltoro's counsel made an objection to the answer, which was sustained, and requested an admonishment, which was given.

[21]    The State contends that this situation is factually similar to that of *Perez v. State*, 728 N.E.2d 234 (Ind. Ct. App. 2000). During Perez's trial, the State was not permitted to discuss Perez's criminal history. A police detective then testified that he had heard that Perez was a convicted felon. Perez's counsel failed to preserve properly his prosecutorial misconduct claim. Nevertheless, this Court determined that the detective's testimony was an "evidentiary harpoon" which placed "inadmissible evidence before the jury so as to prejudice the jurors against the defendant." *Id.* at 237. We further held that this evidentiary harpoon did not place Perez in a position of grave peril because the State made no other mention of Perez's prior felony, and the conviction was supported by independent evidence of guilt. *Id.* at 237-38.

[22]    Even if we were to agree with Deltoro that the State's question to Officer Priem was prosecutorial misconduct, Deltoro fails to establish how this testimony

placed him in grave peril and resulted in fundamental error. Only one reference was made to Deltoro's criminal history, and the trial court admonished the jury to disregard Officer Priem's entire answer, not just the portion about him being a "violent felon." "[W]e are obligated to presume 'that the jury are people of sense, and that they will obey the admonition of the court . . . .'" *Thomas*, 9 N.E.3d at 743-44. After the trial court admonished the jury, the State made no other mention of Deltoro's criminal history during phase one of the trial. Furthermore, as already discussed, there was substantial independent evidence for the jury to convict Deltoro of the charged offenses. Accordingly, we conclude that any prosecutorial misconduct had no probable persuasive effect on the jury's verdict.

[23] Affirmed.

Bailey, J., and Robb, J., concur.