## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 09 2018, 6:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles D. Burrage, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 9, 2018 <br><br> Court of Appeals Case No. 02A04-1712-CR-2877 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable John F. Surbeck, Jr., Judge <br><br> Trial Court Cause No. 02D06-1705-F4-32 |

**Altice, Judge.**

# Case Summary

When police stopped the car in which Charles D. Burrage was riding as a backseat passenger, Burrage jumped out and fled. After chasing down Burrage, an officer returned to the vehicle and discovered a handgun on the back bench seat, in plain view, near where Burrage had been seated before he exited the vehicle and ran from police. Burrage filed a pretrial motion to suppress the handgun, challenging the legality of the traffic stop, and the trial court denied the motion. Following a jury trial, Burrage was convicted of Level 4 felony unlawful possession of a firearm by a serious violent felon and Class A misdemeanor resisting law enforcement. He now appeals his convictions, raising the following restated issues:

> I. Whether the trial court abused its discretion when it admitted the firearm into evidence at trial; and

> II. Whether the State presented sufficient evidence to support Burrage's conviction for unlawful possession of a firearm by a serious violent felon.

We affirm.

# Facts & Procedural History

While driving her four-door black Dodge Magnum on the evening of May 10, 2017, Christina Green picked up her teenage son, I.C.C., from work. Green's co-worker, Ayanna Weaver, was already seated in the front passenger seat, and I.C.C. entered the vehicle and sat in the back seat behind Weaver. As a favor

for a friend, Green then drove to the Hickory Creek Apartments to pick up a man and give him a ride to her own house, where he was to meet other individuals. When Green arrived at the Hickory Creek Apartments, the man, who Green did not know, but who was later identified as Burrage, entered her car and sat in the back seat, on the driver's side.

[4] At that time, Fort Wayne Police Department (FWPD) officers, along with officers from the United States Marshal's Task Force, were conducting surveillance at the Hickory Creek Apartments, having received information that Burrage, who had a pending felony arrest warrant for a violation of his parole, was likely to be in that area. Specifically, FWPD Detective Derrick Demorest had obtained and executed a search warrant for "ping" information on Burrage's phone, and it revealed that the phone was in the Hickory Creek complex. *Motion to Suppress Transcript* at 27. During surveillance at the apartment complex, FWPD Detective James Chambers observed a man matching Burrage's general description get into the backseat of the Dodge Magnum. Already in the car, in addition to the driver, was a front seat passenger and another backseat passenger, who officers later identified as Green's son, I.C.C.

[5] The Dodge Magnum left the Hickory Creek Apartments parking lot heading eastbound on Lower Huntington Road. Some of the surveilling officers followed, while others stayed, in case it was not Burrage who left in the Magnum. While following the Magnum, FWPD Detective Sergeant Mark Brooks observed it "cross the yellow line, the solid yellow line towards the

center four different times in about a half a mile" on Lower Huntington Road. *Transcript Vol. 1* at 115. The driver of the Dodge Magnum did not signal a lane change or a turn on these occasions. Because Detective Sergeant Brooks was in plain clothes and driving an unmarked FWPD vehicle that was not equipped with emergency lights, he was not permitted under Indiana law to initiate a traffic stop, so he notified other officers that he had observed the vehicle "cross the center line four times." *Id.* at 116.

[6] The Dodge Magnum then turned northbound onto Airport Expressway, and Detective Michael Long, who was in full uniform and was driving a vehicle equipped with lights and a siren, activated his vehicle's lights and initiated a traffic stop. According to Green, Burrage told her from the backseat, "[D]on't stop," and she replied, "I'm not a criminal, I don't have anything to hide," at which time she pulled the car over to the right shoulder. *Id.* at 158, 161. I.C.C. noticed that, as the vehicle was pulling over, Burrage was trying to get out of the car, and I.C.C. told Burrage to "calm down and not to get out [sic] the car." *Id.* at 175. As Burrage was exiting the Dodge Magnum, he pulled a gun out of his pants and tried to hand it to I.C.C., but I.C.C. turned away and did not take it. Burrage then exited the car and ran.

[7] Meanwhile, as the Dodge Magnum stopped on the shoulder, Detective Long saw an individual exit the vehicle from the back driver's-side door and run in a northeast direction down into an embankment. Detective Long ordered the individual to stop and chased him a short distance before he deployed a taser causing the man to fall. Detective Long arrested the man for resisting law

enforcement and identified the individual as Burrage. Detective Long's vehicle was equipped with an in-car camera that captured video of the traffic stop and chase.

[8] Detective Long returned to the Dodge Magnum and saw that the remaining three occupants were inside but had their hands extended outside of the windows. Green was in the driver's seat, Weaver was in the front passenger seat, and I.C.C. was seated behind Weaver. As Detective Long approached, I.C.C. told him that the person who ran had left a handgun in the vehicle. Detective Long looked inside and saw a black handgun laying on the middle of the back bench-style seat. The individuals in the car told him that they did not know the man who fled. Detective Long instructed the passengers to exit the vehicle, and they were patted down for officer safety. No other weapons were found on the occupants or in the vehicle.

[9] Detective Long retrieved the handgun, which was a loaded .40 caliber semiautomatic. There was a bullet in the chamber and additional bullets in the magazine. During a search of Burrage, police discovered a baggie in his pocket containing a green weedy substance, later identified as marijuana.

[10] On May 16, 2017, the State charged Burrage with Count I, Level 4 felony unlawful possession of a firearm by a serious violent felon, Count II, Class A misdemeanor resisting law enforcement, and Count III, Class B misdemeanor possession of marijuana. In October 2017, Burrage filed a motion to suppress the handgun and marijuana, asserting that the search and seizure violated his

state and federal constitutional rights.  At the hearing, Burrage's  position was that the traffic stop was invalid because (1) the radioed traffic infractions were that the Dodge Magnum "crossed the center line" a number of times, (2) but the road was actually a three-lane road in the relevant area – one each direction and a center turn lane – such that the Magnum did not cross any center line or violate any statute that required it to stay on the right half of the road, and (3) therefore, "there was no violation that justified the stop [of] the vehicle," and the evidence should be suppressed. *Motion to Suppress Transcript* at 24, 30.  The State responded that traffic violations justified the stop because officers observed the Magnum fail to stay in its lane.  Furthermore, even if there was no traffic violation, the stop was valid for several other reasons:  (1) there was a warrant out for Burrage, and officers had a reasonable suspicion that he was in the car; (2) Burrage had no standing as a passenger to challenge the stop; and (3) Burrage abandoned the weapon when he ran from the car and thereby relinquished all interest in the property.  Following a hearing, the trial court issued an order denying Burrage's motion to suppress, finding:

> Defendant matched the description of the fugitive sought, the traffic stop was valid, the handgun seized was in plain view, was abandoned and Defendant had no standing to object to a search.

*Appellant's Appendix Vol. II* at 71.

[11]     Prior to trial, the trial court granted the State's motion to dismiss Count III.  At trial, when Detective Sergeant Brooks was cross-examined about having radioed to Detective Long that the Magnum drove "left of center" on four

occasions, Detective Sergeant Brooks explained that the vehicle had driven "into the turn lane four times." *Transcript Vol. 1* at 117. Detective Long testified that after learning that "the vehicle had committed a lane violation four different times" on Lower Huntington Road, he moved ahead of the surveillance detective and initiated the traffic stop. *Id.* at 126. Green testified that when she pulled over to the shoulder, "the person that was in my backseat jumped out of my car, took off running," and she heard her son scream, "[T]here's a gun back here." *Id.* at 158, 161. She then turned and saw the gun for the first time. Green testified that the gun was not hers nor her son's, who was less than eighteen years old. A man named Marcel Wheeler, who had been in a relationship with Green on-and-off for six years, testified that he owned the Dodge Magnum, but had not driven it in years. Wheeler testified that the gun was not his and that he did not own a gun or have a permit to carry one. The handgun was admitted into evidence over Burrage's objection. No fingerprints were found on the gun during forensic testing.

[12] The jury found Burrage guilty of resisting law enforcement and carrying a handgun without a license. Burrage waived his right to further proceed with the jury trial and admitted to a prior qualifying felony required to prove he was a serious violent felon in possession of a firearm. After entering judgments of conviction, the trial court sentenced Burrage to six years on Count I and one year on Count II, to run consecutively. Burrage now appeals.

# Discussion and Decision

## I. Admission of Evidence

[13] Burrage argues the trial court abused its discretion when it admitted the handgun into evidence at trial over his objection. In ruling on admissibility following the denial of the motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. *Id.* Because the trial court is best able to weigh the evidence and assess witness credibility, the appellate court will review the trial court's rulings on admissibility for abuse of discretion and reverse only if a ruling is "clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). "But the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Carpenter*, 18 N.E.3d at 1001.

[14] An investigatory stop of a citizen by a police officer does not violate that citizen's constitutional rights if the officer has a reasonably articulable suspicion of criminal activity. *State v. Lynch*, 961 N.E.2d 534, 536 (Ind. Ct. App. 2012). Although "[r]easonable suspicion is a 'somewhat abstract' concept that is not readily reduced to a 'neat set of legal rules,'" it is well settled that a police officer may briefly detain a person whom the officer believes has committed an infraction or ordinance violation. *Id.* at 536-37 (citing Ind. Code § 34-28-5-3, stating that "[w]henever a law enforcement officer believes in good faith that a

person has committed an infraction or ordinance violation, the law enforcement officer may detain that person for a sufficient time"). A decision to stop a vehicle is valid so long as the officer's "on-the-spot evaluation reasonably suggests that lawbreaking occurred." *Id*. at 537. The determination of reasonable suspicion requires de novo review on appeal. *Id*.

[15] Burrage contends that the officers did not have reasonable suspicion to initiate a traffic stop of the Dodge Magnum and that his convictions for unlawful possession of a handgun and resisting law enforcement therefore must be reversed. In particular, Burrage relies on the evidence that Detective Brooks had radioed to other officers and written in his report that the Dodge Magnum "crossed the center line" as it traveled on Lower Huntington Road, but since Lower Huntington Road was a three-lane road, "there was no center line to cross." *Appellant's Brief* at 14, 21; *Defendant's Ex*. B. Thus, Burrage claims, "there was no traffic violation" and the stop was pretextual such that "everything that happened after the vehicle was stopped . . . is subject to be suppressed." *Id*. at 21. As he did at the motion to suppress hearing, Burrage urges that Ind. Code § 9-21-8-2 is the relevant statute and that there is no evidence that he violated it. That statute provides in pertinent part:

> Upon all roadways of sufficient width, a vehicle *shall be driven upon the right half of the roadway* except as follows:
>
> (3) Upon a roadway divided into three marked lanes for traffic under the rules applicable to a roadway divided into three marked lanes.

I.C. § 9-21-8-2(a)(3) (emphasis added). He argues that because Lower Huntington Road is a three-lane roadway, "the driver of the Magnum was not required by statute to drive upon the right half of the roadway," and, in any event, "there was no evidence presented . . . that the vehicle crossed over into the opposite lane of travel." *Appellant's Brief* at 20. Consequently, he argues the stop was invalid, and the firearm should not have been admitted at trial. We disagree.[1]

[16] Burrage's exclusive focus on the "crossed the center line" evidence is too narrow. That is, while there was testimony that Detective Sergeant Brooks had radioed that the vehicle was "left of center" or "crossed the center line" – which Burrage claims is impossible given that it is a three-lane road – Detective Sergeant Brooks gave additional and more explanatory testimony that he observed the vehicle "cross the yellow line, the solid yellow line towards the center four different times in about a half a mile" and described that it had driven "into the turn lane four times." *Transcript Vol. 1* at 115, 117. He also stated that the driver never signaled a lane change. This evidence indicates that

---

[1] Before proceeding with our analysis of the validity of the traffic stop, we note that, at the trial court level, the State argued that Burrage lacked standing to challenge the constitutionality of the search under both the 4th Amendment, because he had no reasonable expectation of privacy in the vehicle in which he was a passenger, as well as under Article 1 Section 11 of the Indiana Constitution, because Burrage had disclaimed any interest in the handgun. In denying Burrage's motion to suppress, the trial court agreed and based its decision, in part, on the determination that Burrage "had no standing to object to a search." *Appellant's Appendix Vol. II* at 71. Although we, like the trial court, have concerns about Burrage's standing to challenge the search, we do not address it in our decision because the State on appeal does not raise any issue or argument concerning standing. *See Bradley v. State*, 4 N.E.3d 831, 838 (Ind. Ct. App. 2014) (in resolving a claim of unlawful search and seizure, an appellate court should not sua sponte invoke lack of standing), *trans. denied*.

the vehicle moved or veered into the center turning lane, which was marked with turning arrows, although the driver did not signal a lane change or turn. Additionally, Detective Sergeant Brooks testified that, in his training and experience, this type of improper lane use "could mean that the driver was impaired or distracted, which are both reasons to cause traffic accidents." *Id.* at 115. Given these facts, we find that the officers had reasonable suspicion to initiate a stop of the Dodge Magnum. *See Pridemore v. State*, 71 N.E.3d 70, 74-75 (Ind. Ct. App. 2017) (finding reasonable suspicion existed to stop a vehicle that had crossed into median area located between opposite lanes of travel, although officer testified to witnessing vehicle "cross left of center").

[17] Furthermore, as the State points out, Burrage's argument that the driver did not violate I.C. § 9-21-8-2(a) because the vehicle did not leave "the right half of the roadway" ignores another statute, I.C. § 9-21-8-11, which provides rules for roadways divided into three or more lanes. It states:

> Whenever a roadway has been divided into three (3) or more clearly marked lanes for traffic, the following rules apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from the lane until the person who drives the vehicle has first ascertained that the movement can be made with safety.
>
> (2) Upon a roadway that is divided into three (3) lanes, a vehicle may not be driven in the center lane except under any of the following conditions:

(A) When overtaking and passing another vehicle where the roadway is clearly visible and the center lane is clear of traffic within a safe distance.

(B) In preparation for a left turn.

(C) Where the center lane is at the time allocated exclusively to traffic moving in the direction the vehicle is proceeding and is signposted to give notice of the allocation.

I.C. § 9-21-8-11.[2]

[18] Here, Detective Sergeant Brooks observed the Dodge Magnum "cross the yellow line, the solid yellow line towards the center four different times in about a half a mile" on Lower Huntington Road and not display a turn signal. *Transcript Vol. 1* at 115. This indicates that, in a short distance, the vehicle repeatedly left its lane of travel and moved "towards the center," which was a turning lane, but the vehicle neither slowed to a stop nor signaled a turn or lane change. The driver thus failed to comply with I.C. § 9-21-8-11. Burrage argues on appeal that because the radio call and written report referred to the vehicle as having crossed the center line, the State on appeal was offering "new and different reasons" to "legitimize the stop," namely I.C. § 9-21-8-11, which he claims should be rejected as contrary to the evidence. *Reply Brief* at 5, 7. It was

---

[2] I.C. § 9-21-8-11 was amended effective July 1, 2018, but we refer to the statute in effect at the time Burrage was charged in 2017.

not a "new and different" reason nor contrary to the evidence, however, as Detective Long explained at the motion to suppress hearing that what occurred was not only crossing a center line; it was also considered "not maintaining a lane." *Motion to Suppress Transcript* at 24. For the reasons stated, the officers had reasonable suspicion to initiate the traffic stop of the Dodge Magnum, and the trial court did not abuse its discretion when it admitted the firearm into evidence at trial.[3]

## II. Sufficiency of the Evidence

[19] Burrage argues that the evidence was insufficient to support his conviction for unlawful possession of a firearm by a serious violent felon.[4] In reviewing sufficiency of the evidence claims, this court does not reweigh the evidence or assess the credibility of witnesses. *Causey v. State*, 808 N.E.2d 139, 143 (Ind. Ct. App. 2004). We consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Id.* We will affirm the conviction "if there is substantial evidence of probative value to support the conclusion of the trier-of-fact." *Id.* The evidence need not

---

[3] The State also asserts that, even if the officers' stop for a violation of traffic laws was unsound, other reasons justified that stop, including: (1) "the officers had reasonable suspicion justifying an identity check of the occupants to confirm that Burrage was in the vehicle"; (2) "the seizure [of the handgun] was attenuated from the stop"; and (3) discovery of the gun was a result of Burrage's own conduct, namely placing it on the seat, which left it in plain view. *Appellee's Brief* at 14, 16, 19. Because we find that the stop was justified for traffic violations, we do not reach the State's arguments.

[4] Burrage concedes that "[i]f this [c]ourt finds that the traffic stop was justified, . . . his actions do constitute the offense of Resisting Law Enforcement." *Appellant's Brief* at 21. Having found that the stop was valid, we confine our sufficiency analysis to the unlawful possession of a firearm by a serious violent felon conviction.

overcome every reasonable hypothesis of innocence. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016).

[20] To convict Burrage of Level 4 felony unlawful possession of a firearm by a serious violent felon, the State was required to prove that (1) Burrage was a serious violent felon as defined in Indiana and (2) he knowingly or intentionally possessed a firearm. *See* Ind. Code § 35-47-4-5. Burrage stipulated at trial that he was a serious violent felon under Indiana law. Thus, on appeal, Burrage's claim "deals solely with the sufficiency of the evidence as it relates to Burrage being in possession of the firearm," which was found on the rear bench seat, near where he had been seated before he exited the car. *Appellant's Brief* at 22.

[21] Here, at trial, I.C.C. testified that, as the vehicle was being stopped by police, Burrage "said he had a gun" and pulled the handgun out of his pants, from "inside the belt." *Transcript Vol. 1* at 173-74. I.C.C. further testified that Burrage "tried to hand it to me," at which time I.C.C. "stopped looking" and did not see Burrage set the handgun on the seat, but saw it there after Burrage had exited the car. After Burrage opened the door and fled, Green heard I.C.C. yell, "There's a gun back here." *Id.* at 161. Green testified that the gun did not belong to her or to I.C.C., and Wheeler, who owned but did not drive the car, testified that it was not his.

[22] Burrage concedes that I.C.C.'s testimony was direct evidence "that [he] actually possessed the firearm" and that I.C.C.'s testimony was supported by Green's testimony. *Appellant's Brief* at 24. But he nevertheless contends that the State

failed to prove he knowingly or intentionally possessed a firearm because (1) the State was unable to provide evidence that Burrage was armed when he came out of the Hickory Creek Apartments; (2) there was no testimony that Burrage made furtive gestures as the vehicle was being stopped; (3) three other individuals remained in the automobile during the time Officer Long chased Burrage on foot, and "[t]his period was long enough for any of the three to place the firearm on the backseat of the vehicle"; and (4) there were no fingerprints linking Burrage to the firearm. *Id*. We find that Burrage's arguments in this regard are challenges to I.C.C.'s eyewitness testimony to seeing Burrage with the gun in the back seat right before he opened the door and ran. On appeal, we cannot reweigh evidence or judge witness credibility. *Causey*, 808 N.E.2d at 143. I.C.C.'s testimony was sufficient to show that Burrage possessed the handgun and left it in the car when he fled. Accordingly, the State presented sufficient evidence to convict Burrage of Level 4 felony unlawful possession of a handgun by a serious violent felon.

[23] Judgment affirmed.

Brown, J. and Tavitas, J., concur.