# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 27 2019, 10:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean P. Hilgendorf
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gregory A. Jones, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | March 27, 2019 <br><br> Court of Appeals Case No. 18A-CR-1739 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Jane Woodward Miller, Judge <br><br> Trial Court Cause No. 71D01-1703-MR-2 |

**Vaidik, Chief Judge.**

# Case Summary

Gregory A. Jones appeals his conviction for murder, arguing that the trial court erred in admitting evidence that the victim was pregnant at the time of her death and that the evidence is insufficient to support his conviction. We affirm.

# Facts and Procedural History

The evidence most favorable to the verdict establishes that in March 2017, Amber Rankin, Kenyatta McCurry, and Kenyatta's two daughters, A.W. and N.M., lived together in a house at 3013 Michigan Street in South Bend. Jones also lived in the house. N.M. was Jones's daughter, and A.W. considered him her dad. Kenyatta was also pregnant with a second child from Jones. However, Jones was also in a relationship with another woman, Tiaira Miller.

Around 8:40 a.m. on March 12, Paul and Betty Fisher were driving on Michigan Street when they saw a little girl walking on the sidewalk, "carrying a bundle that looked like a baby in her arms." Tr. Vol. II p. 53. What really caught the Fishers' attention, however, was that the little girl was barefoot, wearing only a nightshirt even though the temperature was only nineteen degrees. It was Sunday, and the Fishers had just attended the 7:30 a.m. mass at St. Stanislaus.

The Fishers knew something was wrong, so they called 911 and stopped to help the little girl. As the Fishers got out of their car, they heard the little girl scream, "My mommy's dead. I'll never see my mommy again. There was

blood everywhere." *Id.* at 55. The bundle that the Fishers saw the little girl carrying was, in fact, a baby, dressed in a diaper and t-shirt with a blanket draped over her. The Fishers learned that the little girl was eight-year-old A.W., and that the baby was her one-year-old sister, N.M. According to A.W., she thought her mom was asleep but that there was blood on the bed, so she grabbed N.M., left the house, and was "trying to walk to [her] [Aunt] Amber's job to get help." *Id.* at 170. Paul relayed this information to the 911 operator, and officers from the South Bend Police Department were dispatched to the scene.

[5] Officer Keith Walker arrived at 8:46 a.m. and spoke to A.W., who said that her mom was dead. Officer Walker's police car did not have a car seat, so he asked Betty if she would ride along to hold N.M. Betty agreed and rode in the back seat to hold N.M. As Officer Walker drove, A.W. directed him to her house, which was approximately two blocks from where the Fishers had stopped to help her. Officer Walker parked his car in front of the house and went inside to investigate. Betty stayed in the car with N.M. and A.W., who was calling out the window to the police officers as they arrived on scene, "Is my mommy okay? Can you tell me if my mommy's okay?" *Id.* at 66. For a time, Betty was able to console A.W., but when the officers "brought out the yellow tape, [A.W.] started crying again." *Id.* Betty tried to comfort A.W. by telling her that maybe her mom was sleeping, but A.W. responded, "No. He told me that she was probably dead." *Id.* at 70. A.W. explained that "her dad was in the

house that morning, and that he told her that her mommy was probably dead." *Id*. at 77. A.W. also told Betty that her dad was Jones. *Id*.

[6] Once inside the house, Officer Walker found Kenyatta lying face down on a bed in the back bedroom. Officer Walker yelled to announce himself but did not get an answer, so he checked Kenyatta's pulse. Officer Walker could not find a pulse and Kenyatta was not moving, and as he moved closer, Officer Walker saw "a pool of coagulated blood underneath [Kenyatta's] head." *Id*. at 84. Paramedics arrived and pronounced her dead. Kenyatta had been shot "inside her mouth." *Id*. at 195. Once officers from the homicide unit arrived on scene, Officer Walker drove Betty, A.W., and N.M. to the homicide office. On the way, Officer Walker asked A.W. who else lives in the house besides her mom and sister. A.W. told Officer Walker that her "[Aunt] Amber" lives in the house and that Jones is "there sometimes." *Id*. at 91-92. Officer Walker also asked A.W. who left first that morning, and she told him that "Aunt Amber went to work first, then [Jones] left." *Id*. at 106.

[7] Back at the house, crime-scene technicians began processing the scene. In the bedroom where Kenyatta was found, the officers found "a spent .40 caliber" Smith & Wesson casing in between the bed and wall. Tr. Vol. III p. 26. Inside one of the bedroom-dresser drawers, the officers located several firearm cartridges. In the living room, the officers observed a bag of marijuana, an open purse on the floor, and some $1 bills. *Id*. at 17. In a hall closet, officers found a 9mm handgun magazine sticking out of the pocket of a black North Face jacket. *See id*. at 19-20, 82.

[8]     Later that morning, at around 10:30 a.m., homicide detectives went to Rally's restaurant to find Amber. After the detectives told Amber what had happened to Kenyatta, she told them what she could about that morning. Amber recalled that Kenyatta came into her bedroom and said, "Oh, wake up. You're going to be late for work. You got to go to work. It's 8:16." Tr. Vol. II p. 131. Amber said that she jumped up and went straight to the bathroom to get ready for work. After about "ten minutes at most" because she was "super rushing," Amber headed toward the front door to leave. *Id*. at 132. On her way out, Amber saw Kenyatta and Jones walking toward Kenyatta's bedroom. Neither one said anything to Amber as she left for work. According to Amber, this "was weird" because normally Kenyatta would say something like "I will see you" or "Have a good day at work," but that morning Kenyatta "didn't say anything." *Id*. As Amber left, she noticed that the living-room TV was on and that her two nieces were asleep on the couch in front of the TV. After Amber left the house, she headed straight to her job at Rally's.

[9]     Meanwhile, also at around 10:30 a.m., Jones showed up at Tiaira's house. Tiaira had just gotten home after spending the morning with her boyfriend, Kaelyn, and was not expecting Jones. Jones told Tiaira that "the police w[ere] there," that she had to "hurry up," and that they "had to leave." Tr. Vol. III p. 150. Tiaira quickly gathered her things and got into Jones's car. Jones asked Tiaira to drive and directed her toward Michigan Street. Once they were in the car, Jones told Tiaira, "I was with you all night. Remember that. Just say you w[ere] with me all night." *Id*. at 151. When Tiaira asked what was going on,

Jones responded, "I love you. Just say you w[ere] with me all night. We w[ere] together all night." *Id*. Jones continued directing Tiaira where to drive until they reached their destination, which according to Tiaira was the house "[w]here the thing happened." *Id*. There were "a whole bunch of police cars" at the house, and Jones told Tiaira to drive past the house several times. *Id*. Then Jones "all of [the] sudden" got on the phone and said, "Whoa . . . my nephew just told me that somebody killed my baby mama." *Id*. at 152. After hanging up the phone, Jones told Tiaira to drive to a parking lot where he met his mom, his "people," and "some guys." *Id*. at 155. From there, Jones told Tiaira to drive to the homicide office. As they arrived at the homicide office, Jones asked Tiaira to use her phone and if he could "throw some money in [her] bag." *Id*. at 156. Tiaira agreed, giving Jones her phone and putting $4980 of his money in her purse. Once Jones and Tiaira were inside the homicide office, Jones went "crazy," yelling things like "[w]here my baby mama at?" *Id*. at 159. Jones and Tiaira were then separately interviewed by detectives.

[10] In his statement, Jones said that he had two children with Kenyatta: N.M. and another child "due in September." Ex. 80 (video). Later, however, Jones told the detectives that he did not know if the baby was actually his because Kenyatta recently contracted an STD that he got tested for and did not have. Throughout the interview, Jones discussed his suspicions that Kenyatta was sleeping with someone else "behind [his] back." *Id*. Specifically, Jones said that "if the baby come out and it ain't mine, I be f*cked up man." *Id*. When the detectives asked Jones when he last saw Kenyatta, he initially claimed that

the last time he had seen her was the night before at Chuck E. Cheese, where they were having N.M.'s first birthday party. Jones said that Kenyatta told him that she was going to the casino after the party. Jones did not go to the casino and thought that Kenyatta went to the casino with "some mystery guy that she's been dealing with." *Id*. He said that after the party, he and Tiaira hung out all night and then he took Tiaira home around 9:45 a.m. that morning. Jones explained that he was "with [Tiaira] now 'cause there's been some fishy sh*t going on." *Id*. Jones said that he and Tiaira had been "talking" for a month or two, that he wanted to "make [Tiaira] [his] fiancée," and that that morning he had planned on "changing all [his] numbers," taking Tiaira "out of town," and buying her a house. *Id*. When the detectives told Jones that they had video and cell-phone evidence, Jones admitted that he was at the house that morning to "grab some money," but that when he left, Amber was still at the house. *Id*. Jones denied killing Kenyatta.

[11]  At the same time, Tiaira gave her own statement to detectives. She initially told the detectives that she was with Jones all night but later admitted that they had separated at "like 3:30 in the morning." Tr. Vol. III p. 160. Tiaira said that she had known Jones for "like two-and-a-half weeks" and that they were not boyfriend and girlfriend. *Id*. at 144. Tiaira explained that she had a boyfriend named Kaelyn, and that she and Jones were just "hanging out." *Id*. at 145. Tiaira said that the night before, she and Jones "went to BW3's" and "Wal-Mart" until "about 3:30 in the morning," when she went home. *Id*. at 146. Tiaira said that after she went home, Kaelyn picked her up, and she spent the

rest of the night at Kaelyn's apartment in Laurel Woods in north South Bend. Tiaira said at around 8:40 a.m. that morning, her phone rang and when she looked at her phone, she saw "[a] whole bunch of calls and a text message" from Jones. *Id*. at 149. The text message said, "Oh, I f*cked it up." *Id*. at 191. At around 10:30 a.m. Kaelyn dropped Tiaira off at her house, and shortly afterwards, Jones came over and told her that they had to leave.

[12] After Jones and Tiaira finished giving their statements to the detectives, they were both arrested. Jones was charged with murder and Tiaira was charged with Level 5 felony assisting a criminal.[1] While they were in booking, Jones told Tiaira, "I'm sorry. I love you." and "I want to marry you." *Id*. at 167. According to another inmate who was in the booking area, Jones also told Tiaira "to stay silent and not to fold and to stick to the plan so he could beat this." *Id*. at 197. Tiaira responded by yelling, "You set me up, bastard." *Id*.

[13] Jones's jury trial was held in May 2018. During trial, the parties addressed whether the evidence that Kenyatta was pregnant at the time of her death was admissible. After hearing argument from both the State and defense counsel, the trial court allowed the State to present evidence that Kenyatta was pregnant because it was relevant to Jones's motive for committing the crime.

[14] The State presented the testimony of then nine-year-old A.W., who said that on the day of the shooting, she remembered waking up on the living-room couch

---

[1] After Jones's trial, the State dismissed Tiaira's Level 5 felony assisting-a-criminal charge.

and hearing Jones calling her mom's name. A.W. said that when she opened her eyes, she saw Jones standing in the living room. A.W. testified that Jones came over and said something to her and then left. A.W. could not remember what Jones said to her. A.W. said that after she woke up, she went into her mom's room and thought she was asleep but saw blood on the bed. A.W. testified that Amber was not at the house when she woke up so she "grabbed [N.M.] and left out of the house" to get help. Tr. Vol. II p. 170. Amber also testified and remembered that that morning, Jones "looked weird . . . like he was crazy or something." *Id*. at 134. Amber explained that Kenyatta was pregnant and that "there was an understanding" the baby was Jones's. *Id*. at 126. Amber also recalled that that morning Jones was wearing a black North Face jacket. Dr. Elizabeth Douglas, a pathologist, testified that she performed an autopsy on Kenyatta and found that the cause of death was "an intra-oral gunshot wound." *Id*. at 195. Based on Dr. Douglas's examination of the entrance wound, she believed that the barrel of the gun was inserted all the way into Kenyatta's mouth. Dr. Douglas explained that to illustrate how far back the barrel was in Kenyatta's mouth, you would need to "put your finger all the way back behind your teeth, almost making yourself choke." *Id*. at 201. Dr. Douglas testified that the autopsy also revealed that Kenyatta was ten-weeks pregnant. Finally, Detective Timothy Wiley testified that he examined Jones's cell-phone records and was able to determine that Jones's cell phone was near the house when Kenyatta was killed.

[15]    The jury found Jones guilty of murder, and the trial court sentenced him to the maximum term of sixty-five years.

[16]    Jones now appeals.

# Discussion and Decision

## I. Admission of Evidence

[17]    First, Jones contends that the trial court erred in admitting evidence that Kenyatta was pregnant at the time of her death. The admission of evidence is within the sound discretion of the trial court, and the decision whether to admit evidence will not be reversed absent a showing of manifest abuse of the trial court's discretion resulting in the denial of a fair trial. *Evans v. State*, 30 N.E.3d 769, 776 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

[18]    Generally, relevant evidence is admissible. Ind. Evidence Rule 402. It is also well settled that evidence of motive is relevant in the proof of a crime. *Tompkins v. State*, 669 N.E.2d 394, 397 (Ind. 1996). Further, the admission of evidence having a tendency to create an inference of motive is within the discretion of the trial court. *Id.* Here, Jones contends that "the fact that [Kenyatta] was pregnant" is not relevant because there is "no evidence" that the pregnancy "contributed to any possible motive for Jones to have committed this crime." Appellant's Br. p. 15. This is not so. In his statement to police, Jones

repeatedly discussed his concern that Kenyatta was involved with other men. *See* Ex. 80 (video). Specifically, Jones said that he did not know if the baby was his because Kenyatta had been "sleeping around." *Id*. Evidence of Kenyatta's pregnancy was relevant because it created an inference of Jones's motive. As such, the trial court did not abuse its discretion in finding that the evidence that Kenyatta was pregnant was relevant as to motive.

[19] Nonetheless, Jones contends that "[a]ny possible probative value" of the evidence "would be substantially outweighed by the likely prejudicial effect." Appellant's Br. p. 15. Indiana Evidence Rule 403 provides that the trial court may exclude relevant evidence if its probative value is "substantially outweighed" by a danger of, among other things, unfair prejudice. The danger of unfair prejudice arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury. *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *reh'g denied, trans. denied*. A trial court's decision regarding whether the admission of evidence violates Rule 403 is accorded a great deal of deference on appeal, and we review it only for an abuse of discretion. *Tompkins*, 669 N.E.2d at 398. Here, while the evidence of Kenyatta's pregnancy may have been prejudicial to Jones, he does not explain why the prejudice was unfair. *See Wages*, 863 N.E.2d at 413. Moreover, we agree with the State that any additional sympathy that the jury may have felt for Kenyatta because of her pregnancy "was only marginally more than it would" have already had for her "as the mother of two very young children, one of whom

found her dead." Appellee's Br. p. 22. Accordingly, given that Rule 403 requires that the danger of unfair prejudice "substantially outweigh" the probative value before the evidence may be excluded, the trial court did not commit error by admitting evidence that Kenyatta was pregnant.[2]

## II. Sufficiency of Evidence

[20] Next, Jones contends that the evidence is insufficient to support his conviction. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id*. It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id*. (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

[21] Jones argues that the evidence, at best, only proves that he "possibly had the opportunity to commit the crime." Appellant's Br. p. 11. Specifically, Jones highlights that there were "no witnesses who pointed the finger at Jones," that there was "no shot spotter in the area," that there were "no cameras [to show]

---

[2] The State argues that Jones failed to make "timely objections" to the evidence that Kenyatta was pregnant and that therefore we should address this issue as fundamental error. Appellee's Br. p. 19. Because we find no error in the admission of the evidence, we do not need to address the State's argument.

where Jones was or was not near the time of the murder," that "no blood [was] found on Jones' clothes," that there was "no evidence [of] any argument" between Jones and Kenyatta, and that there was "no murder weapon" linked to Jones. Appellant's Br. pp. 12-13. However, all of these things were pointed out to the jury during trial, and the jury found Jones guilty of murder. Moreover, in making his sufficiency challenge, Jones does not acknowledge the other evidence admitted in this case. The evidence shows that Jones was the only person in the house with Kenyatta and her two daughters when Amber left for work at around 8:26 a.m. Betty also testified that A.W. said that Jones told her "mommy was probably dead." Furthermore, Jones admitted that he was at the house with Kenyatta that morning, and cell-phone records showed that Jones's cell phone was near the house when Kenyatta was killed. Finally, there is also evidence that Tiara attempted to provide a false alibi for Jones to the police, testifying that Jones told her to "[j]ust say you w[ere] with me all night. We w[ere] together all night." Tr. Vol. III p. 151. *See McKinstry v. State*, 660 N.E.2d 1052, 1053 (Ind. Ct. App. 1996) (attempts to fabricate an alibi may be considered evidence of consciousness of guilt on the part of the accused). Accordingly, Jones's sufficiency challenge fails.

[22]   Affirmed.

Mathias, J., and Crone, J., concur.