FILED

Mar 16 2016, 3:08 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT,
SAMUEL E. SALLEE

Jane Ann Noblitt
Columbus, Indiana

ATTORNEYS FOR APPELLEE,
STATE OF INDIANA

Gregory F. Zoeller
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 03S00-1504-LW-00237

SAMUEL E. SALLEE,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Bartholomew Circuit Court, No. 03C01-1312-MR-06529
The Honorable Stephen R. Heimann, Judge

On Direct Appeal from a Sentence of Life Imprisonment Without Parole

**March 16, 2016**

**David, Justice.**

Samuel E. Sallee directly appeals his convictions for murdering four (4) people and his four (4) consecutive sentences of life without parole. Sallee argues that the evidence is insufficient to support the jury's determination that he is guilty of the four (4) murders. Finding that the evidence is sufficient, we affirm the trial court.

## Facts and Procedural History

In May 2013, Sallee was unemployed and was living with a former co-worker, Malcolm England, in Columbus, Indiana. England let Sallee stay with him on the condition that Sallee would assist England with work around the house. Sallee had to borrow money from his girlfriend, as well as England, in order to buy gasoline for his vehicle. Sallee was in possession of his son's .22 caliber rifle that could hold at least 12 rounds. He had used this rifle previously on his sister's property in Brown County.

On May 11, 2013, Sallee travelled to the home of Katheryn Burton in Waynesville, Indiana. Katheryn lived with her son, Daniel Burton, her boyfriend, Tommy Smith, and another relative, Shawn Burton. A neighbor, Aaron Cross, was visiting at the time of Sallee's visit.

The Burton household used drugs—marijuana and methamphetamine ("meth"). Tommy and Shawn would also cook meth, on occasion, with Katheryn's assistance. Sallee used meth and would sometimes purchase meth from them. At the time of this visit, Sallee was attempting to sell or trade the .22 caliber rifle to Tommy for drugs. Tommy declined. At approximately 3:30 p.m., Daniel left for work; Sallee was still at the Burton home at that time.

That evening, Sallee was supposed to pick up his girlfriend, but he was late. His girlfriend called him at approximately 7:15 p.m. to ask where he was. Sallee told her he was working for a man named Estal Gabbard, who is known as "Gabby." However, Gabby testified at trial that the last time Sallee had worked for him was in April.

A surveillance video from a local business showed Sallee traveling away from the Burton home at approximately 7:45 p.m. At approximately 8:00, p.m., Sallee called a friend to ask if the friend would store some things for him. The friend told Sallee he could store some of Sallee's tools but that he did not have room for all of Sallee's stuff. Sallee then picked up sandwiches and beer and went back to England's house. He repaid England $40-$50 for gas money he borrowed and then finally, at approximately 10:00 p.m., he picked up his girlfriend.

Meanwhile, at approximately 10:30 p.m., Daniel was returning home from work. He called the house on his way home but received no answer. When he arrived home, he discovered the dead bodies of Tommy and Aaron in the living room. He also discovered that the door to his mother's bedroom was locked and he assumed she was also dead. He called 911. Tommy had been shot in the neck and head. Shawn was shot twice in the head. Aaron had been shot six times in the head, shoulder and chest. Katheryn had several knife wounds on her face, and she was shot in the head and stabbed in the back with a knife. The house was ransacked.

Daniel gave police a list of items missing from his home that included: Katheryn's jewelry, a gold Zelda Nintendo bag used to store collectible magazines, a wooden stash box containing Daniel's marijuana and Taco Bell service pins, copies of Led Zeppelin CDs with writing on them, a pellet gun, a crossbow and a compound bow.

The day after the murders, Sallee shaved his beard which he had worn for two years. He also washed his clothes, shoes and a pair of gloves. He cleaned England's toilet with bleach as well. He took his girlfriend to Walmart and bought over $100 of paint, tools and other items, paying in cash. He then spent the day preparing to paint his truck in England's garage. Sallee's girlfriend had never heard Sallee talk about painting this truck before.

In the garage, England observed a box containing insulation foam and metal shavings on the workbench that looked like shavings from a rifle barrel. England threw the box of insolation foam in the trash. England observed that Sallee was "moping around" his garage and acting guilty or like something was on his mind. (Tr. 753, 798, 805.)

Sallee was arrested on an unrelated Brown County arrest warrant. Police found $96 on Sallee at that time. When asked about the murders, Sallee admitted he was at home of the victims the day of the murders, but insisted he left after an ambulance that was assisting a neighbor and blocking the driveway had gone. He also claimed that everyone was alive when he left.

Sallee placed a call from the Brown County jail, seeking to have his friend sell some items from England's garage. Because he did not want to discuss the matter over the phone, Sallee had

3

his friend come visit him to discuss the items he wanted to sell, but the friend could not hear Sallee's whispers about what Sallee wanted to sell.

The police executed a search warrant for England's home and found the gun stock of the .22 rifle owned by Sallee's son that had been in Sallee's possession, another rifle, Katheryn's jewelry and Daniel's Taco Bell service pins. Later, England called police back to his home on three (3) occasions when he discovered other property from Daniel's home, including the wooden stash box, the Led Zeppelin CDs, the Zelda bag, the crossbow and the compound bow. Police also found Sallee's Walmart receipt, and they cut the insolation foam found in the box England threw in the trash, revealing the wallets of Tommy, Aaron and Shawn inside.

After Sallee finished serving his Brown County sentence, he was transported to Marion County to be held on federal weapons charges. There Sallee met Devon Price. Price was also being held for federal charges. Sallee bragged to Price about the murders, stating that he could not be prosecuted for them because the police did not have the gun, and he didn't leave any evidence. Sallee told Price that he (Sallee) knew two of the victims because he bought drugs from them and that, because he had no money, he wanted to trade his gun for drugs, but that one of the victims would not make the trade.

Sallee further told Price that even though his plan to trade his gun for drugs did not work, he was going to get the drugs anyway, by robbery, but when he announced the robbery to the group with his gun, one of the victims did not take him seriously. Sallee then shot the man as well as the other two men. Sallee did not tell Price what he did to the female victim, Katheryn, but he mentioned to Price that he wished that she had not been there and that he didn't have to do what he did to her. Sallee told Price he then ransacked the house, taking cash, drugs and a gun he found in the house and that he went to go get some food afterwards. Sallee said he wanted to be in the "public eye" after the crimes. (Tr. 1231.) He bragged that he washed his clothes, sawed his gun into pieces and left the gun he took from the victims where he was staying as a "bait gun." (Tr. 1232- 1233.) He told Price that he didn't think the deaths would cause great concern because the victims were "drug dealers" and "dopers." (Tr. 1234-1235.) Price testified against Sallee at

trial. However, Price received no deal for his federal charges in exchange for his testimony in Sallee's state case.

The State firearm expert opined that the .22 rifle possessed by Sallee would fit with the pieces found in England's garage and further, that the rifle would match the .22 caliber bullets removed from the victims. The expert also determined that four (4) of the casings police recovered at the murder scene and three (3) casings recovered in Brown County, where Sallee had previously used the .22, were once in the same gun.

The State charged Sallee with four (4) counts of murder. A jury found him guilty of each count and recommended a sentence of life without parole. Sallee was sentenced to life without parole for each of the four counts of murder, with the sentences to run consecutively.

This appeal comes directly to our Court because a sentence of life without parole was imposed. See Ind. Appellate Rule 4(A)(1)(a). Sallee argues that the evidence is insufficient to support his convictions. For reasons discussed more fully herein, we hold that the evidence is sufficient and affirm the trial court.

**Standard of Review**

When reviewing the sufficiency of the evidence to support a conviction, "appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict." McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. Wright v. State, 828 N.E.2d 904, 906 (Ind. 2005). It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." Moore v. State, 652 N.E.2d 53, 55 (Ind. 1995). "[E]vidence is sufficient if an inference may reasonably be drawn from it to support the verdict." Drane v. State, 867 N.E.2d 144, 147 (Ind. 2007) (citations omitted.)

5

**Discussion**

In his direct appeal, Sallee challenges the sufficiency of the evidence to convict him of four (4) murders. He argues he was "at the wrong place at the wrong time." (Appellant's Brief at 13.) He challenges the evidence because: 1) there's no DNA evidence or fingerprints linking him to the crime; 2) there's no motive for him to have committed the crime; 3) a neighbor of the victims, Carl Furkin's, testimony conflicts with the State's proposed timeline of events; 4) Sallee denied committing the crimes; 5) the State's firearm expert could not say with 100% certainty that Sallee's gun was the one used to commit the murder; and 6) there were other explanations for the murders such that the State's case was based on speculation and suspicion. We will address each argument in turn.

First, Sallee makes much of the fact that there is no DNA evidence or fingerprints linking him to the crime. However, while DNA or fingerprint evidence would have served to make the State's case stronger, it is not necessary for a conviction. A conviction for murder may be sustained on circumstantial evidence alone. Green v. State, 587 N.E.2d 1314, 1315 (Ind. 1992). In this case the circumstantial evidence reveals that: 1) Sallee went to great lengths to cover up his crime including: shaving his beard that he had worn for some time, beginning to alter the appearance of his truck, washing his clothing, including his gloves and shoes, destroying the barrel of the .22 rifle and attempting to sell or conceal the items taken from the Burton home; and 2) Sallee bragged to Price that he would get away with the crimes because he didn't leave any evidence. Accordingly, it is not surprising nor fatal to the State's case that no DNA or fingerprint evidence linked Sallee to the murders.

Sallee next questions whether the State adequately proved that he had a motive to commit the murders. He argues that there is no evidence that "his desire for drugs was that great — or would lead to such a violent reaction." (Appellant's Brief at 13.) However, all the State had to prove was the statutory elements of murder. The State is not required to prove motive. See Bunch v. State, 697 N.E.2d 1255, 1257 (Ind. 1998). Nevertheless, the evidence reflects that Sallee did not have money and was seeking drugs prior to the murders. He had both money and drugs afterwards. Also, he told Price that he started shooting after one of the victims did not take him seriously when he tried to commit robbery. Thus, despite the fact that State was not required to

6

prove motive, the State did present evidence that money, drugs and anger may have motivated Sallee to commit the murders.

Sallee also argues that the evidence is insufficient because one of the pieces of evidence does not fit. Specifically, Sallee argues that one of Katheryn's neighbors, Carl Furkin, testified that on the day of the murders he heard "pops" coming from the Burton home and then police arrived shortly thereafter, at about 8:30 p.m. Sallee argues that this testimony conflicts with video surveillance showing what appeared to be Sallee's truck headed away from the Burton home and into Columbus at 7:45 p.m. However, this inconsistency is not particularly significant in light of the other evidence that: 1) Furkin admitted that it was not uncommon to hear out-of-season fireworks in his neighborhood; and 2) Furkin had been drinking and had fallen asleep on the night of the murder and his approximation of the timeline of events may be faulty. Furkin's timeline being inaccurate or Furkin hearing something other than the gunshots that killed the victims (e.g., fireworks) are reasonable inferences that would support the verdict.

Sallee also argues that he "adamantly declared" his innocence to police and only Price's self-serving testimony identified him as the murderer.[1] However, a conviction can be sustained on the testimony of a single witness, even where the evidence is uncorroborated. Bailey v. State, 979 N.E.2d 133, 135 (Ind. 2012). The jury was entitled to credit or discredit Price's testimony. Sallee was free to attempt to impeach Price for bias. However, Price did not receive a plea deal for his testimony as he was facing federal charges and Sallee's murder case is a state action. Also, Price's testimony was corroborated by the circumstantial evidence. Further, Sallee's adamant declaration of innocence can also be characterized as self-serving. We will not reweigh the evidence or judge the credibility of witnesses.

Sallee also faults the State firearm expert's testimony because the expert did not state with 100% certainty that the gun used by Sallee to fire shots in Brown County is the same gun used to

___

[1] In his Appellant's Brief, Sallee initially argued that the State's case was "purely circumstantial." (Appellant's Brief at 1.) However, during oral argument, Sallee's counsel conceded that Sallee's confession to Price is direct evidence. Indeed, a confession of guilt to another is direct evidence. Carr v. State, 728 N.E.2d 125, 131 (Ind. 2000) (citations omitted.) We appreciate counsel's presentation and candor.

7

commit the murders. However, there is no authority holding that such evidence must be 100% certain. Indeed, even the beyond a reasonable doubt standard employed in criminal cases is not such a strict standard.

Finally, Sallee argues that the State's case is mere speculation and suspicion. Evidence sufficient only to establish a mere suspicion of guilt is not sufficient to support a conviction. Beasley v. State, 267 Ind. 396, 370 N.E.2d 360, 362 (1977). In support of his argument that the State had only mere suspicion, Sallee states that there are other possibilities to explain the evidence, e.g., England was involved, Sallee was set up or Sallee stole the property but didn't commit the murders. However, the jury heard the evidence presented and concluded that Sallee was guilty of the murders. Further, the alternate theories proffered by Sallee on appeal are inconsistent with the evidence that was presented—that Sallee confessed to the murders to Price, that Sallee took steps to change his appearance and that of his vehicle and destroyed his firearm, and that England's testimony suggested he (England) was home when the murders occurred. Accordingly, the State's case was more than mere suspicion and speculation.

**Conclusion**

The State presented ample evidence that Sallee committed the four (4) murders. The record demonstrates that Sallee was at the Burton home the day of the murders with a gun. Sallee had previously used this gun on his sister's property in Brown County. The State firearm expert testified that four (4) of the casings police recovered at the murder scene and three (3) casings recovered in Brown County, where Sallee had previously used the gun, were once in the same gun. Property stolen from the victims was recovered from where Sallee was staying. There is also evidence that Sallee attempted to alter his appearance and his vehicle's appearance after the murders and to sell or destroy evidence of the crime. Sallee bragged to fellow inmate, Price, about his crimes and Price's detailed testimony about what Sallee told him about the crimes is consistent with the circumstantial evidence connecting Sallee to the murders.

The evidence is sufficient to support Sallee's four (4) murder convictions. We affirm the trial court.

Rush, C.J., Dickson, Rucker, and Massa, J.J., concur.