## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 11 2017, 9:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Grady, *Appellant-Defendant,* | December 11, 2017 |
| v. | Court of Appeals Case No. 49A05-1705-CR-01082 |
| | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Kurt Eisgruber, Judge |
| | Trial Court Cause No. 49G01-1506-MR-021890 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Michael Grady appeals his conviction for murder, arguing that the evidence is insufficient to prove that he is the one who shot and killed the victim. Finding the evidence sufficient, we affirm.

# Facts and Procedural History

[2] The facts most favorable to the verdict reveal that in June 2015, Adrienne Alexander lived on the eastside of Indianapolis with her sons, nineteen-year-old David Phelps and seventeen-year-old Andre Phelps. On June 15, Adrienne's nineteen-year-old niece, Leah Dixon, spent the night at their house. In the early morning hours of June 16, Adrienne, Leah, David, and Andre were upstairs sleeping when Andre, who shared a bedroom with David, heard a "loud boom," which was the front door being kicked in. Tr. Vol. II p. 104. Andre then heard footsteps and saw that David had woken up as well. Andre, through the cracked bedroom door, saw the stairway light come on and then heard footsteps coming up the stairs. A male in a burgundy hoodie and black mask covering the bottom half of his face peeked his head through the door and said, "Is any mother fu**in body in here?" *Id.* at 109. The male looked directly at Andre, but Andre did not know if the male saw him. Andre later described the person as a light-skinned black male about his age with yellow or hazel eyes. After receiving no response to his question, the male walked toward Adrienne's bedroom. David followed.

[3] Meanwhile, Adrienne and Leah, who were sleeping in Adrienne's bedroom, woke up when they heard a voice asking who was in there. Adrienne, who had gotten out of bed, saw a male walking into her bedroom. At first, she thought the male was one of her sons' friends. But then she saw a gun pointed at her and heard David ask, "[W]hat are you doin[g] in here?" *Id.* at 79. Adrienne, who was about two to three feet away from the male, later described him as black, about sixteen or seventeen years old, with a slender build wearing a burgundy hoodie and a black mask covering the bottom half of his face. Adrienne ran into the bathroom, locked the door, and lay on the floor. Adrienne then heard "lots of shots" followed by "someone gaspin[g] for air." *Id.* at 83. When she no longer heard any shots, she ran out of the bathroom, grabbed her cell phone, and ran back into the bathroom to call 911. The 911 dispatcher told Adrienne that Andre, who at this point was hiding in his closet, was also calling 911.

[4] When Leah first heard the voice asking who was in there, she thought she was dreaming. She saw three black males: one standing in the doorway with a gun and two standing outside the door in the upstairs loft area. The gunman asked Leah who she was, but she did not respond. Leah saw that the gunman had "dreads" pulled into a ponytail and a mask on his face.[1] *Id.* at 144. Leah then saw David run out of his room and fight the intruders. David slammed one of

---

[1] Leah testified on cross-examination that there was "no hoodie on the gunman"; however, she clarified on redirect that "the hoodie wasn't up." Tr. Vol. II pp. 151-53.

the intruders into a wall and another into a glass table that was in the loft. As the gunman watched this unfold, Leah hid underneath the bed. When the gunman turned around and did not see Leah, he walked out of Adrienne's bedroom, pointed the gun straight at David, and fired "[m]ore than five" shots, killing him. *Id.* at 148. From underneath the bed, Leah watched the gunman shoot David. The intruders then ran out of the house.

[5] Indianapolis Metropolitan Police Department officers were dispatched to the house at 2:31 a.m. When they first arrived, they noticed that the frame to the front door was split. They went upstairs, where they found David lying face down in the loft. There were spent shell casings by his body and a shattered glass table. Later, they found a wallet on the sidewalk that led up to the front door. The wallet contained a State of Indiana Identification Card for "Michael Grady," a Stonybrook Middle School identification card from the 2010-11 school year for "Michael Grady," and a VISA pay card that was signed "Michael Grady" on the back. Exs. 25-27; Tr. Vol. II p. 49.[2]

[6] Starting around 3:30 a.m., Grady spoke to a close friend, A.H., on the phone for about an hour. Grady told her that he had shot someone. Tr. Vol. II p. 174.

[7] On June 17, Adrienne went to the police station, where a detective showed her a photo array and asked if she could identify anybody. Adrienne said she was

_____

[2] The wallet also contained an IndyGo "ADA Paratransit" bus pass for Steven McClendon. Although McClendon initially was a suspect, he was eliminated when the police went to his house and discovered that he was "severely handicapped" and had "no legs." Tr. Vol. III p. 9.

not 100% sure but selected photos #1 and #5; Grady's photo was #5. Ex. 53. Andre was also shown a photo array. Andre was also not 100% sure but selected photo #3; Grady's photo was #3. Ex. 56. Because neither Adrienne nor Andre were 100% sure, it was the policy of the detective not to have them circle a photo and sign the array.

[8] Detectives went to Grady's house and spoke with his mother, Lynette. They learned that seventeen-year-old Grady did not come home the night of June 15. Lynette texted him twice between 1 and 2 a.m. on June 16, asking him "Whats up." Ex. 92. Grady responded to his mother at 3:03 a.m., texting "my bad momma I just spent the night cause I wasn't gone [sic] be able to be home on time and my phone was off." *Id.* Lynette told detectives that she saw Grady on June 16, either in the late morning or early afternoon, and Grady told her that he "lost his ID and pay card." Tr. Vol. II p. 163. Lynette told detectives that Grady was supposed to come home the night of June 16 (his curfew was midnight), but Grady did not come home that night either or in the days following.

[9] Eventually, on June 19, detectives, with the help of the U.S. Marshals Service, located Grady at a relative's house.

[10] The State charged Grady with the murder of David. Following a jury trial, Grady was convicted. The trial court sentenced him to fifty-five years, with fifty-two years in the Department of Correction followed by three years in community corrections.

Grady now appeals.

# Discussion and Decision

Grady contends that the evidence is insufficient to support his conviction for murder. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

Grady argues that there is "insufficient reliable evidence" to prove that he is the one who shot and killed David. Appellant's Br. p. 9. The evidence shows that Adrienne and Andre were shown photo arrays. While they were not 100% positive in their identifications, Andre selected Grady's photo and Adrienne selected two photos, one of which was Grady's. Both Adrienne and Andre described the person as a black male around sixteen or seventeen years old; Grady was seventeen years old. Although Leah was not shown a photo array, when she saw the gunman, his hood was off, and he had dreads pulled into a ponytail. When Grady was arrested, he had dreads pulled into a ponytail. Ex. 88.

[14] But this is not the only evidence that the State presented regarding Grady's identification as the murderer. Grady spoke to a close friend, A.H., about an hour after the murder. During their hour-long conversation, Grady told A.H. that he had shot someone. In addition, at the house, the police found a wallet containing two identification cards with Grady's name and a VISA pay card with Grady's signature. Grady told his mother that he had lost his "ID and pay card." Grady also did not come home the night of the murder. His mother texted him twice between 1 and 2 a.m., and Grady responded shortly after 3 a.m. Finally, although Grady was supposed to return home on the night of June 16, he did not return home that night either. Grady could also not be found in the days following the murder. He was eventually located on June 19 with the help of the U.S. Marshals Service. *See Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (noting that evidence of flight may be considered as circumstantial evidence of consciousness of guilt), *reh'g denied*. We find that the evidence is sufficient to support Grady's conviction for murdering David.

[15] Nevertheless, Grady argues that the evidence is insufficient for three reasons: (1) Adrienne and Andre were not 100% positive in their photo-array identifications[3]; (2) the fact that Grady's wallet was found at the house equally "support[s] the inference . . . that someone had his identity;" and (3) A.H. was "highly reluctant" and "had to be prodded" to testify at trial. Appellant's Br.

---

[3] Grady clarifies that he is not raising as issues that the trial court abused its discretion in admitting testimony about the photo identifications or that the police presented unduly suggestive photo arrays. Appellant's Br. p. 11.

p. 13. But these are not attacks on the sufficiency of the State's evidence. Rather, they are requests for us to reweigh the evidence and judge the credibility of the witnesses, which we will not do. While the State's evidence is not overwhelming, it is certainly sufficient to support the jury's verdict. We therefore affirm Grady's conviction.

[16]  Affirmed.

May, J., and Altice, J., concur.