## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 19 2019, 10:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Randall J. Hammond
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rickey R. Armour,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 19, 2019

Court of Appeals Case No.
18A-CR-2970

Appeal from the
Allen Superior Court

The Honorable
Wendy W. Davis, Judge

Trial Court Cause No.
02D04-1802-F2-4

**Kirsch, Judge.**

[1] After arranging three controlled buys of heroin between Rickey R. Armour ("Armour") and a confidential informant ("the CI"), police searched Armour's

residence, finding more heroin and two handguns. Armour was later convicted after a jury trial of: dealing in cocaine or narcotic drug,[1] as a Level 2 felony; two counts of dealing in cocaine or narcotic drug,[2] as Level 3 felonies; dealing in cocaine or narcotic drug,[3] as a Level 4 felony; unlawful possession of a firearm by a serious violent felon,[4] a Level 4 felony; and maintaining a common nuisance,[5] a Level 6 felony. Armour raises the following issues on appeal:

I. Whether sufficient evidence supported his convictions; and

II. Whether the trial court committed prejudicial error in refusing Armour's proposed instruction on constructive possession.

We affirm.

## Facts and Procedural History

On November 22, 2017, Detective Kurt Franceus ("Detective Franceus") of the Fort Wayne Police Department coordinated a controlled buy where Armour would sell heroin to the CI. *Tr. Vol. I* at 116-18. The CI exchanged text messages with Armour. *Id.* Armour told the CI to drive to the intersection of

---

[1] *See* Ind. Code § 35-48-4-1(e)(2).

[2] *See* Ind. Code § 35-48-4-1(d).

[3] *See* Ind. Code § 35-48-4-1(c).

[4] *See* Ind. Code § 35-47-4-5(c).

[5] *See* Ind. Code § 35-45-1-5(c).

Gaywood Drive and Rudisill Boulevard in Fort Wayne. *Id*. at 118. The CI told Detective Franceus that he had met Armour in that area before. *Id*. Detective Franceus searched the CI before the heroin purchase. *Id*. at 116-17.

[4] Driving an unmarked police car, Detective Franceus took the CI to the designated intersection and parked nearby. *Id*. at 119. The CI texted Armour to let him know he had arrived. *Id*. at 120. After a few minutes, a Toyota Matrix drove up and parked behind Detective Franceus's vehicle. Looking into his rearview mirror, Detective Franceus, who was familiar with Armour's appearance, identified the driver and sole occupant of the Matrix as Armour. *Id*. The CI exited Detective Franceus's vehicle, walked to Armour's vehicle, entered the front passenger door, and handed Armour pre-recorded buy money. *Id*. at 122-24. Armour then gave the CI a "bindle," which is a folded piece of paper; the bindle contained a chunky substance consistent with heroin. *Id.* at 124. The substance was later confirmed to be 0.74 grams of heroin. *Tr. Vol. II* at 22. Detective Franceus drove away and went to a post-buy location where he searched the CI again. *Tr. Vol. I* at 126.

[5] On December 1, 2017, Detective Franceus arranged a second controlled buy with the same CI and Armour. *Id*. at 128. Police believed that Armour resided at 526 East Rudisill Boulevard ("the house"), and, at the time of the second controlled buy, Sergeant Brad Schultz ("Sergeant Schultz") of the Fort Wayne Police Department was watching the house. *Id*. at 165-66. The CI exchanged text messages with Armour to buy heroin. *Id*. at 129-30. Armour directed the CI to the same location as the first controlled buy. The CI was searched, given

$120 in buy money, and Detective Franceus drove him to the intersection of Gaywood and Rudisill. *Id.* When they arrived, the CI texted Armour that he had arrived at the agreed buy location. *Id.* at 130.

[6] As Detective Franceus and the CI waited for Armour, Sergeant Schultz saw "a tall thin male black subject with long braids," consistent with a description of Armour, exit the house and enter a white Monte Carlo, a vehicle police had already determined that Armour was known to drive. *Id.* at 166. As the Monte Carlo drove away, Sergeant Schultz followed it to the location where Detective Franceus and the CI were waiting. *Id.* at 130, 167. Detective Franceus identified Armour as the driver of the Monte Carlo. *Id*. at 130. The CI exited Detective Franceus's vehicle, walked directly to the Monte Carlo, and entered the vehicle. *Id.* During the thirty seconds that the CI was inside of Armour's vehicle, he handed the buy money to Armour. *Id*. at 129-31. The CI returned to Detective Franceus's vehicle with 0.84 grams of heroin. *Tr. Vol. II* at 22. When Armour drove away, Sergeant Schultz followed him back to the house, which Armour entered. *Tr. Vol. I* at 167.

[7] Detective Franceus arranged a third controlled buy for January 22, 2018. *Id*. at 134. The CI texted Armour, who instructed the CI to meet Armour at the same location as the previous controlled buys. *Id.* at 135. The CI was searched, given money, and driven to the buy location by Detective Franceus. *Id.* Meanwhile, Detective Mark Walters ("Detective Walters") of the Fort Wayne Police Department watched the house. *Id*. at 138, 171-72. He saw Armour pull up in the Toyota Matrix, exit the vehicle, approach the door at the house, open

the door with a key, and enter. *Id.* at 173. Armour later left the house and drove to meet the CI. *Id.* at 136, 174. Armour parked in front of Detective Franceus's vehicle. *Id.* at 136-37. The CI exited Detective Franceus's vehicle, walked to Armour's vehicle, entered it, and emerged thirty seconds later with 1.4 grams of heroin. *Id.* at 131, 138; *Tr. Vol. II* at 22. After Detective Franceus departed, the CI was again searched. *Tr. Vol. I* at 139. Detective Walters followed Armour after the purchase and saw Armour return to the house. *Id.* at 174-75.

[8] Detective Franceus obtained a search warrant for the house, and the warrant was executed on January 30, 2018. *Id.* at 141. When officers entered the house, Armour and a female were sitting on the living room floor near a couch; the butt of a handgun could be seen jutting out from underneath the couch.[6] *Id.* at 142, 144, 188; *State's Exs.* 9, 10. Also near that couch were two cell phones; the number for one of the cell phones matched the number of the cell phone that the CI used to contact Armour. *Tr. Vol. I* at 144; *State's Ex.* 9. The master bedroom contained two closets, one containing female clothes and the other containing male clothes. *Tr. Vol. I* at 204. Inside the male closet, officers found a box containing paperwork bearing Armour's name; one paper was an employment earnings statement, and the other paper was a receipt issued by an Allen County court in an infraction case. *Tr. Vol. I* at 225; *State's Exs.* 14, 15.

---

[6] Police found a second gun in a nightstand in the master bedroom, but we discuss only one handgun, the one found on the living room floor, except where reference to the second handgun is appropriate. *Tr. Vol. I* at 147.

Also inside that closet, officers found: (1) a bag containing 18.03 grams of heroin; (2) $1,100.00 in cash, which was inside a shirt pocket; and two digital scales. *Tr. Vol. I* at 206; *Tr. Vol. II* at 22; *State's Ex.* 16. On the floor of the closet was a small safe, and Armour was in possession of the key that opened the safe. *Tr. Vol. I* at 206.

[9] Armour was charged as follows: Count I - dealing in cocaine or narcotic drug, a Level 2 felony; Counts II and III - dealing in cocaine or narcotic drug, as Level 3 felonies; Count IV - dealing in cocaine or narcotic drug, a Level 4 felony; Count V - unlawful possession of a firearm by a serious violent felon, a Level 4 felony; Count VI - maintaining a common nuisance, a Level 6 felony; and Count VII - possession of marijuana, hash oil, hashish, salvia, or a synthetic drug, a Class B misdemeanor, which was later dismissed. *Appellant's App. Vol. II* at 13, 22-31.

[10] At trial, Stephanie Phommachanh ("Stephanie"), Armour's girlfriend, testified that Armour was not living at the house when the search warrant was executed but that he did occasionally spend the night. *Tr. Vol. II* at 35-36. She admitted that she and Armour had lived together at the house for some time but explained that Armour moved out so that they could figure out their relationship. *Id.* Stephanie also testified that at the time of the search warrant, her brother in law, Breondon Pinkston ("Pinkston"), was living with her. *Id.* at 28-30. She further explained that because Pinkston was living with her, she gave him one of the two closets in the master bedroom to store his things. *Id.* at

34-35. Stephanie also testified that the cash found in the closet was hers and that she owned the two guns found in the residence. *Id.* at 32-33.

[11] At trial, Armour proposed the following final instruction on constructive possession:

> Constructive possession is the intent and capability to maintain dominion and control over the item. Proof of a possessory interest in the dwelling where the item is found might be adequate to show the capability to maintain control over the item. *However, when possession of the dwelling is not exclusive, the inference of intent must be supported by additional circumstances* that point to the Defendant's knowledge of the nature of the item and its presence. Mere presence where an item is located or association with person [sic] who possess [sic] the item is not alone sufficient to support a finding of constructive possession.

*Appellant's App. Vol. II* at 102 (emphasis added). The trial court rejected this instruction and instead gave the definition of possession from the Indiana Pattern Jury Instructions:

> The word "possess" means to own or to exert control over. The word "possession" can take on several, but related, meanings.
>
> There are two kinds of "possession" - actual possession and constructive possession. A person who knowingly has direct physical control of a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.

Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, then the possession is sole. If two or more persons share actual or constructive possession of a thing, then possession is joint.

Possession may be actual or constructive, and either alone or jointly with others.

*Appellant's App. Vol. II* at 118. *See* Ind. Pattern Jury Instructions-Criminal 14.3060. The jury found Armour guilty on all counts. *Tr. Vol. II* at 90, 101; *Appellant's App. Vol. II* at 133, 135-36. The trial court sentenced Armour to concurrent terms for all six counts, resulting in an aggregate sentence of twenty-five years. *Id*. at 135. Armour now appeals his convictions.

# Discussion and Decision

## I.    Sufficiency of Evidence

Armour argues that the evidence was insufficient to support each of his six convictions.

When reviewing sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. It is the fact-finder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the trial court's ruling. We affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Parks v. State*, 113 N.E.3d 269, 272 (Ind. Ct. App. 2018) (internal citations omitted). It is not necessary that evidence overcome every reasonable hypothesis of innocence. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). Evidence is sufficient to support the verdict if an inference may reasonably be drawn from the evidence. *Id.*

[12] Armour makes one set of arguments for the convictions arising out of the three controlled buys[7] and another set of arguments for the convictions arising out of the drugs and weapons found at the house.[8] As to the convictions arising out of the controlled buys, Armour argues that: 1) during each controlled buy, no officer witnessed the actual exchange of heroin and cash between Armour and the CI; and 2) the evidence as to Armour's identify as the perpetrator was insufficient. As to his claim that the State did not provide sufficient evidence to identify him as the perpetrator, Armour observes that there was no video surveillance of the drug transactions or still pictures taken of the transactions. *Id.* at 175. He also notes that Detective Franceus testified that he could identify the driver as Armour during the first two buys, but Armour questions the reliability of the identification because Armour claims Detective Franceus saw him Armour only through the rear-view mirror of Detective Franceus's car. *Id.*

---

[7] The convictions arising from the controlled buys are Counts II and III, dealing in cocaine or narcotic drug, as Level 3 felonies, and Count IV, dealing in cocaine or narcotic drug, a Level 4 felony.

[8] The convictions arising from the contraband found at the house are Count I, dealing in cocaine or narcotic drug, a Level 2 felony; Count V, unlawful possession of a firearm by a serious violent felon, a Level 4 felony; and Count VI, maintaining a common nuisance, a Level 6 felony.

at 120, 130. As to the third controlled buy, Armour correctly notes that Detective Franceus admitted that he could not make a positive identification of the person who sold heroin to the CI. *Id.* at 136.

[13] Pursuant to Indiana Code section 35-48-4-1(a)(1)(C) the State was required to prove that Armour knowingly or intentionally delivered heroin to the CI. Furthermore, the State was required to show that Armour possessed the heroin before the buy and before he transferred it to the CI. *See* Ind Code § 35-48-1-11 ("Delivery" is defined as "an actual or constructive transfer from one (1) person to another of a controlled substance . . . ."). "A properly conducted controlled buy will permit an inference the defendant had prior possession of a controlled substance." *Watson v. State,* 839 N.E.2d 1291, 1293 (Ind. Ct. App. 2005).

[14] We reject Armour's sufficiency of evidence claims regarding the controlled buys. First, the State presented sufficient evidence that Armour was the person who sold heroin to the CI. For two of the drug buys, Detective Franceus identified Armour as the driver and sole occupant of the vehicle that arrived after the CI arranged the heroin sales. *Tr. Vol. I* at 120, 130. For the third buy, although Detective Franceus could not see Armour, Armour was driving the same vehicle that he had driven to the first controlled buy. *Id*. at 120; 136-37. Also, other officers followed Armour from the house and then back to the house. *Id*. at 171-75. One of the officers, Sergeant Schultz, saw someone who matched Armour's description – a black male with shoulder-length braids - enter the house. *Id.* at 173-74. Further, the CI contacted the same phone number for each of the buys and a cell phone with this phone number was

found in the living room at the house, the residence where Armour was located when police executed the search warrant. *Id.* at 135, 144, 153. Second, the State presented sufficient evidence that the drug transactions actually occurred. During each of the three controlled buys, the CI entered Armour's car only briefly before returning to Detective Franceus's car with heroin. *Id.* at 120, 123-24, 129-31, 136, 138; *Tr. Vol. II* at 22. Third, because Armour does not challenge the propriety of the controlled buys, we may infer that Armour possessed the heroin before meeting the CI. *See Watson*, 839 N.E.2d at 1293. Thus, the State presented sufficient evidence to support Armour's convictions arising out of the three controlled buys. Armour's arguments impermissibly ask us to reweigh the evidence. *See Parks*, 113 N.E.3d at 272.

[15] Armour also contends the State failed to present sufficient evidence to support the convictions arising out of the drugs and weapons that the police found when they executed the search warrant at the house. His argument rests on one assertion - he did not possess or constructively possess the heroin and handgun. As to the heroin, Armour argues that he did not have access to the closet and shoebox where the heroin was found. In support, he cites Stephanie's testimony that he no longer lived at the house. *See Tr. Vol. II* at 28; 35-36. Thus, Armour argues that because he "was not living at the residence at the time, it is hard to say that anything in the home belonged to him." *Appellant's Br.* at 24. Citing Stephanie's testimony again, Armour argues that the eighteen grams of heroin found in the shoebox belonged to Pinkston, Stephanie's brother-in-law. *Tr. Vol. I* at 145-46, 206-07, 224-25; *Tr. Vol. II* at 28, 30.

Continuing to rely on Stephanie's testimony, Armour claims that the $1,100, which was found in the pocket of a shirt, belonged to Stephanie. *Tr. Vol. II* at 36-37.

As to the handgun, Armour contends, as he did with the heroin, that there was no evidence that he had access to the handgun or that he owned the handgun. He cites Stephanie's testimony that she owned both handguns. *Tr. Vol. II* at 32-33. He also observes that both handguns were sent for fingerprint analysis, and Armour's fingerprints could not be found on either handgun and that a DNA analyst testified that she could not confirm that Armour had ever handled either gun. *Tr. Vol. I* at 155; *Tr. Vol. II* at 4.

To prove constructive possession, the State must show that a defendant has both 1) the intent to maintain dominion and control over the contraband and 2) the capability to maintain dominion and control over the contraband. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). To prove dominion and control, the State must demonstrate that a defendant is able to reduce the controlled substance to his personal possession. *Matthews v. State*, 792 N.E.2d 934, 936-37 (Ind. Ct. App. 2003). A substance can be possessed jointly by a defendant and another without any showing that the defendant physically possessed the object. *Armour v. State*, 762 N.E.2d 208, 216 (Ind. Ct. App. 2002), *trans. denied*. However, when possession is non-exclusive, the State must show that the defendant had actual knowledge of the presence and illegal nature of the substance. *Id.* "This knowledge may be inferred from either the exclusive dominion and control over the premise containing the contraband, or, where,

as here, the control is non-exclusive, with evidence of *additional circumstances* pointing to the defendant's knowledge of the presence of the contraband." *Ericksen v. State*, 68 N.E.3d 597, 601 (Ind. Ct. App. 2017), *trans. denied* (emphasis added). Additional circumstances include: 1) proximity of the defendant to the contraband; 2) location of the contraband within the defendant's plain view; and 3) location of the contraband within close proximity of items owned by the defendant. *Id.* The third additional circumstance is highly relevant in determining whether the defendant knew about the presence and nature of the contraband. *Jones v. State*, 807 N.E.2d 58, 65-66 (Ind. Ct. App. 2004) (bills and receipts, made out to defendant, in close proximity to contraband constituted evidence of additional circumstances that proved Jones had the intent to maintain dominion and control over the contraband), *trans. denied*.

[18] Here, we find that the evidence sufficiently established that Armour constructively possessed the heroin found in the shoebox and the handgun found on the living room floor. First, the jury could have reasonably inferred that Armour resided at the house instead of just stopping by sporadically. During one of the controlled buys, an officer saw Armour enter the house with a key. *Tr. Vol. I* at 173. Officers saw a framed picture of Armour and his girlfriend and three children at the residence. *Id.* at 220; *State's Ex.* 20. Police found paperwork bearing Armour's name inside one of the closets. *Tr. Vol. I* at 206; *State's Exs.* 14, 15. Police found the heroin in a closet that contained male clothing; the clothing was consistent with Armour's size. *Tr. Vol. I* at 205. On

the floor of the closet was a small safe, and Armour was in possession of the key that opened the safe. *Id*. at 206. Thus, the State's evidence sufficiently established that Armour constructively possessed the heroin. *Cf. Wilkerson v. State*, 918 N.E.2d 458 (Ind. Ct. App. 2009) (court affirmed finding defendant constructively possessed cocaine found in shoebox in bedroom closet of house where he lived). Armour's reliance on Stephanie's testimony is an impermissible request to reweigh the evidence. *See Parks*, 113 N.E.3d at 272.

[19] As to the handgun, the State's evidence also sufficiently established that Armour constructively possessed the handgun. Police found the handgun in plain view on the living room floor, and Armour was sitting on the floor within a few feet of the handgun. *Tr. Vol. I* at 142, 144, 188, 190. Because the handgun was in such close proximity to Armour, it was reasonable to infer that he had the ability to reduce the handgun to his personal possession. Armour's arguments that he never handled the handguns and that Stephanie owned both handguns ask us to reweigh the evidence. *See Parks*, 113 N.E.3d at 272. Thus, there was sufficient evidence that Armour constructively possessed the handgun. *Cf. Massey v. State*, 816 N.E.2d 979 (Ind. Ct. App. 2004) (evidence sufficient to support finding that defendant exercised control over guns to establish constructive possession of firearms, although he had non-exclusive control; guns were found in his upstairs bedroom in home where defendant lived with his wife and children, and thus defendant had ability to reduce guns to his personal possession).

[20] Armour's final sufficiency argument challenges his conviction for Count VI, maintaining a common nuisance.[9] Armour contends the evidence showed that he did not live in the house and that the heroin belonged to Pinkston. Constructive possession of drugs provides sufficient evidence for maintaining a common nuisance. *Jones*, 807 N.E.2d at 67. Maintaining a structure as a common nuisance does not require a person's ownership of the premises. *Mack v. State*, 23 N.E.3d 742, 758 (Ind. Ct. App. 2014), *trans. denied*. Instead, a structure used as a residence is controlled by the person who lives in it, and that person may be found in control of any drugs discovered inside the residence, whether he is the owner, tenant, or just an invitee. *Id.*

[21] Here, the jury could have reasonably inferred that Armour resided at the home instead of just visiting sporadically. During one of the controlled buys, an officer saw Armour enter the house with a key. *Tr. Vol. I* at 173. When officers executed the search warrant at the home, they saw a framed picture of Armour and his girlfriend and three children. *Id.* at 220; *State's Ex.* 20. Police found paperwork bearing Armour's name in one of the closets. *Tr. Vol. I* at 206. Armour possessed a key to a small safe in the same bedroom closet. *Id.* This evidence that Armour resided at the home, and the evidence that he

---

[9] "A person who knowingly or intentionally maintains a common nuisance commits maintaining a common nuisance, a Level 6 felony." Ind. Code § 35-45-1-5(c).

constructively possessed the heroin found in the closest, provided sufficient evidence to support Armour's conviction for maintaining a common nuisance.

## II. Instruction on Constructive Possession

[22] Armour argues that the trial court committed prejudicial error when it refused his tendered instruction on constructive possession. Armour proposed the following final instruction on constructive possession:

> Constructive possession is the intent and capability to maintain dominion and control over the item. Proof of a possessory interest in the dwelling where the item is found might be adequate to show the capability to maintain control over the item. However, when possession of the dwelling is not exclusive, the *inference of intent must be supported by additional circumstances* that point to the Defendant's knowledge of the nature of the item and its presence. Mere presence where an item is located or association with person [sic] who possess [sic] the item is not alone sufficient to support a finding of constructive possession.

*Appellant's App. Vol. I* at 102 (emphasis added). The trial court rejected this instruction and instead gave the definition of possession contained within the Indiana Pattern Jury Instructions, which does not include language about "additional circumstances":

> The word "possess" means to own or to exert control over. The word "possession" can take on several, but related, meanings. There are two kinds of "possession"- actual possession and constructive possession. A person who knowingly has direct physical control of a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a

given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.

Possession may be sole or joint.  If one person alone has actual or constructive possession of a thing, then the possession is sole.  If two or more persons share actual or constructive possession of a thing, then possession is joint.

Possession may be actual or constructive, and either alone or jointly with others.

*Id.* at 118.  *See* Ind. Pattern Jury Instructions-Criminal 14.3060.

[23] Jury instruction is left to the sound discretion of the trial court.  *O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012.  When we review a trial court's refusal to give a proposed instruction, we ask whether the proposed instruction: 1) is a correct statement of the law; 2) is supported by the evidence; 3) was already covered by other instructions.  *Id.*  Even if we find that a trial court erred in refusing a defendant's proposed instruction, we will not reverse a conviction unless a defendant shows that his substantial rights have been prejudiced.  *Coats v. State*, 697 N.E.2d 1261, 1262 (Ind. Ct. App. 1998), *trans. denied*; *see also Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998).

[24] Armour first argues that his proposed instruction correctly stated that where possession of a residence is non-exclusive, the State must show "additional circumstances" to establish that a person knew about the presence of the

controlled substance to prove the person's intent to possess the controlled substance. In support, he quotes *Bergfield v. State*:.

> [W]hen possession of the premises is not exclusive, the inference of intent must be supported by additional circumstances pointing to an accused's knowledge of the nature of the controlled substances and their presence.

531 N.E.2d 486, 490 (Ind. 1988); *see also Macklin v. State*, 701 N.E.2d 1247, 1251 (Ind. Ct. App. 1998).[10] Thus, Armour contends that the instruction is a correct statement of the law. He also argues that the evidence supported giving his proposed instruction because the evidence established, at most, that his possession of the house was non-exclusive. Notably, the State agrees that Armour's proposed instruction was a correct statement of the law and that the evidence supported giving the instruction. *See Appellee's Br.* at 18.

[25]  Here, we agree that the instruction was a correct statement of the law. *See O'Connell*, 970 N.E.2d at 172; *Bergfield*, 531 N.E.2d at 490; *see also Appellee's Br.* at 18. We also agree with Armour that his proposed instruction was not covered by other instructions. Finally, we agree that the evidence supported the

---

[10] The State correctly observes that *Bergfield* and *Macklin* address: (1) what constitutes sufficient evidence of constructive possession to support a conviction, not how constructive possession should be defined in a jury instruction; and (2) that our appellate courts have cautioned against using language from sufficiency-of-evidence cases to determine the proper language of an instruction. *See, e.g., Batchelor v. State*, 119 N.E.3d 550, 563 (Ind. 2019); *Ludy v. State*, 784 N.E.2d 459, 462 (Ind. 2003). However, the State does not demonstrate how our courts' misgivings about using sufficiency-of- evidence cases to determine the appropriate language for an instruction apply here, specifically that using language from a sufficiency case for an instruction could place too much emphasis on certain facts. *See Brooks v. State*, 113 N.E.3d 782, 785 (Ind. Ct. App. 2018). Thus, we have no qualms about looking to *Bergfield* and *Macklin* for guidance on this issue.

giving of the instruction because even though the evidence supported the inference that Armour resided at the home, the evidence left open the possibility that his possession of the home was non-exclusive as the evidence supported that Stephanie also resided there. *See O'Connell*, 970 N.E.2d at 172. Therefore, in refusing Armour's instruction, the trial court committed error.

[26] However, the error was not prejudicial. In *Coats v. State*, 697 N.E.2d 1261, 1263 (Ind. Ct. App. 1998), *trans. denied*, we found that the trial court erred by refusing Coats's tendered instruction that would have advised the jury that in a prosecution for operating a motor vehicle while suspended, the State must prove that a defendant knew that his license was suspended. However, we found that the error was harmless because, at trial, the State introduced Bureau of Motor Vehicles records showing that it had mailed notice of Coats's suspension to him. *Id*. at 1263-64. Thus, we held that the trial court's improper refusal to give the tendered instruction did not require reversal. *Id.* at 1264.

[27] Here, the refusal to give the instruction was likewise harmless because the State presented substantial evidence of Armour's intent to constructively possess the heroin and handgun. *See Bergfield,* 531 N.E.2d at 490; *Macklin*, 701 N.E.2d at 1251. For instance, police found the heroin in a closet that contained male clothing, and the clothing was consistent with Armour's size. *Tr. Vol. I* at 205. They also found a small safe on the floor in the closet, and Armour possessed the key to the safe. *Id*. at 206. Police also found a box that contained paperwork bearing Armour's name. *Id.*; *State's Exs.* 14, 15. As to the handgun, the officers saw Armour sitting on the living room floor within a few feet of the

handgun, which was in Armour's plain view. *Id.* at 142, 144, 188; *State's Exs.* 9, 10. Thus, because the State presented substantial evidence of additional circumstances about Armour's intent to possess the heroin and handgun, the trial court's refusal of Armour's proposed instruction did not prejudice his substantial rights. *See Coats*, 697 N.E.2d at 1262.

[28] Affirmed.

Vaidik, C.J., and Altice, J., concur.