## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 20 2020, 8:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John M. Haecker
Squiller & Hamilton, LLP
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jacob M. Nodine,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 20, 2020

Court of Appeals Case No.
20A-CR-290

Appeal from the DeKalb Superior Court

The Honorable Kevin P. Wallace, Judge

Trial Court Cause No.
17D01-1910-F6-381

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jacob Nodine (Nodine), appeals his conviction for theft, a Level 6 felony, Ind. Code § 35-43-4-2(a).

We affirm.

# ISSUES

Nodine raises two issues on appeal, which we restate as the following:

(1) Whether the trial court abused its discretion by admitting certain evidence; and

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to convict Nodine of theft.

# FACTS AND PROCEDURAL HISTORY

On September 5, 2019, Kenneth Jenkins (Jenkins) arrived at approximately 9:45 p.m. at the Wal-Mart in Auburn, Indiana, to work his shift that began at 10:00 p.m. and lasted until 7:00 a.m. the following morning. Because he was running late, he accidently left his car keys in his 1998 Pontiac Grand Prix.

At 12:08 a.m. on September 6, 2019, about a quarter of a mile from the Wal-Mart at which Jenkins worked, Officer Justin Nawrocki (Officer Nawrocki) of the Auburn Police Department conducted a traffic stop of a silver Dodge Durango which had a broken headlight. The person in the passenger seat identified himself as Nodine. Shortly after that traffic stop, the Wal-Mart

surveillance cameras captured the same silver Dodge Durango coming from "the general area" where Officer Nawrocki had made the traffic stop and enter the Wal-Mart's parking lot. (Transcript Vol. II, p. 121). The surveillance video further showed one of the occupants exit the silver Dodge Durango, enter Jenkins' Pontiac Grand Prix and drive away with the vehicle. At the end of his shift the following morning, Jenkins walked to the parking lot, but his vehicle was gone. Jenkins reported the incident to the police.

[6] On September 10, 2019, Allen Tink (Tink) was at his car repair shop when two men walked into his shop. One of the men, who identified himself as "Jake," stated that his car had broken down and he wanted to know whether he could park it on Tink's property. (Tr. Vol. II, p. 91). When Tink checked, there were two cars on the side of the road: a Pontiac Grand Prix and a Dodge Durango. Tink agreed and told the men to leave the keys inside the vehicle. The two men thereafter pushed the Pontiac Grand Prix into Tink's driveway.

[7] During their investigation, the police discovered that the Dodge Durango was registered to a car dealership in Ohio. After the police contacted the dealership, the dealership supplied information which directed the officers to Nodine's address. Also, as part of their investigation, the police began checking areas in the county where officers had "been recovering stolen vehicles through a rash of car thefts." (Tr. Vol. II, p. 175). On September 12, 2019, when the police visited Tink's car repair shop, they found Jenkins' Pontiac Grand Prix.

[8] When the police spoke to Tink, he reported that "a kid by the name of Jake stated that [his] car had broke[n] down outside [and] asked if he could leave the vehicle there." (Tr. Vol. II, p. 177). Tink indicated that although he did not know Jake's last name, he had "seen him around town a few times." (Tr. Vol. II, p. 177).

[9] The day after Jenkins' vehicle was recovered, Detective Mark Heffelfinger (Detective Heffelfinger) processed the vehicle and he found a cigarette butt, a cup, and a straw. DNA analysis showed that Nodine contributed to the DNA sample found on the straw. Detective Heffelfinger later visited Tink's shop and he showed Tink a photograph of Nodine to determine if Nodine was the person Tink knew as Jake. Tink confirmed that Nodine was Jake and that it was Nodine, who, with the help of another male, pushed Jenkins' vehicle into his shop's driveway.

[10] On October 4, 2019, the State filed an Information, charging Nodine with two Counts of theft, Level 6 felonies, one Count of criminal mischief, a Class A misdemeanor, and one Count of driving while suspended, a Class A misdemeanor. Prior to his jury trial, the State dismissed all the charges but for the one theft charge relating to Jenkins' vehicle. At trial, Nodine moved to suppress Tink's prior identification of him based on the photograph supplied by Detective Heffelfinger, but his motion was denied. During Tink's testimony and outside the presence of the jury, Nodine made an offer of proof about Tink's prior identification of him from the one photograph supplied by Detective Heffelfinger. When Tink was questioned as to whether he

remembered identifying Nodine from the photograph, Tink stated that he could not remember ever seeing the photograph. Later in the trial, Detective Heffelfinger testified, over Nodine's objection, that Tink had identified Nodine from the photograph he had supplied as the man who identified himself as Jake and as the same man who had pushed Jenkins' vehicle into Tink's shop. At the close of the evidence, the jury found Nodine guilty as charged. On January 16, 2020, the trial court conducted a sentencing hearing and sentenced Nodine to an executed two-year sentence in the Indiana Department of Correction.

Nodine now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

When ruling on the admissibility of evidence, the trial court is afforded broad discretion, and we will only reverse the ruling upon a showing of abuse of discretion. *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id*. We consider the evidence most favorable to the trial court's ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *Id*.

Nodine argues that Detective Heffelfinger's procedure of identifying him from a single photograph was unduly suggestive. Nodine claims that the circumstances around the identification procedure indicate that it likely

produced a mistaken identification, and Detective Heffelfinger's testimony that Tink identified Nodine as Jake from a single photograph should not have been admitted into evidence.

[14] "The Due Process Clause of the Fourteenth Amendment requires suppression of testimony concerning a pre-trial identification when the procedure employed is impermissibly suggestive." *Swigeart v. State*, 749 N.E.2d 540, 544 (Ind. 2001). A pre-trial identification may occur in a manner so suggestive and conducive to mistaken identification that permitting a witness to identify a defendant at trial would violate due process. *Id.* A pre-trial photographic identification is impermissibly suggestive "if it raises a substantial likelihood of misidentification given the totality of the circumstances." *Id.* An argument that an identification is unduly suggestive is weakened when the witness is not identifying an unknown defendant but is instead used "simply to confirm that the [suspect that the witness] identified was the same person as the defendant." *Neukam v. State*, 934 N.E.2d 198, 201 (Ind. Ct. App. 2010).

[15] In *Neukam*, Neukam fathered a child with his ex-girlfriend Jamie Dolan (Dolan), but Dolan had started dating Carlos Aquino (Aquino). *Id.* at 199. Sometime thereafter, Neukam sent Aquino a text message telling him not to talk to Dolan. *Id.* In response, Aquino telephoned Neukam, who told Aquino to watch his back. *Id.* One day, Neukam went to Dolan's house and began hitting Aquino's car with a flashlight. *Id.* Aquino was able to drive away to work but was followed by Neukam. *Id.* When Aquino eventually parked and exited his vehicle, Neukam began battering Aquino with the flashlight,

rendering him unconscious. *Id.* At the hospital, an officer interviewed Aquino, and Aquino gave the officer Neukam's name as his attacker. *Id.* Later, Aquino went to the police station where he was shown a single photograph, a BMV photograph of Neukam, and Aquino identified the person in the photo as Neukam. *Id.* The State charged Neukam with battery and criminal mischief. *Id.* Neukam subsequently filed a motion to suppress Aquino's pre-trial identification of him arguing that the identification process was unduly suggestive because the police only showed Aquino one photo of him that had his name. *Id.* The trial court denied his motion, and at the conclusion of his jury trial, Neukam was found guilty as charged. *Id.* On appeal, Neukam argued that the trial court committed reversible error by overruling his motion to suppress Aquino's pre-trial identification. *Id.* We disagreed and found that the identification procedure where Aquino confirmed to the police that Neukam was the same person from the BMV photograph, was not impermissibly suggestive. *Id.* at 201. A key part of that holding was that although the police showed Aquino a single photograph of Neukam, it was not so that Aquino could identify an unknown assailant, but simply to confirm that Neukam was the same person as the defendant. *Id.*

[16] The State argues that we should reach a similar result as our holding in *Neukam*. Turning to the facts of this case, when the police spoke with Tink, Tink reported that a kid named Jake had told him that his car had broken down outside his shop, and asked Tink to store the vehicle at his shop. Tink additionally stated that although he did not know Jake's last name, "he'd seen

him around town a few times." (Tr. Vol. II, p. 177). Like the holding in *Neukam*, Nodine was not stranger to Tink. Tink had met Nodine/Jake or at least seen him in person before Nodine/Jake brought him the stolen vehicle. As in *Neukam*, Tink already knew the suspect and he simply confirmed that the perpetrator he knew matched the picture shown to him by Detective Heffelfinger. Thus, like in *Neukam*, we hold that Detective Heffelfinger's procedure of having Tink confirm that the person who introduced himself as Jake was Nodine, was not unduly suggestive. Accordingly, we hold that the trial court did not abuse its discretion in admitting the pretrial identification of Nodine.

## II. *Sufficiency of the Evidence*

[17] When reviewing a claim of insufficient evidence, it is well-established that our court does not reweigh evidence or assess the credibility of witnesses. *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). Instead, we consider all the evidence, and any reasonable inferences that may be drawn therefrom, in a light most favorable to the verdict. *Id*. We will uphold the conviction "'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id*. (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)). Circumstantial evidence alone is sufficient to support a conviction. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). Circumstantial evidence need not overcome every reasonable hypothesis of innocence. *Clemons v. State*, 987 N.E.2d 92, 95 (Ind. Ct. App. 2013). Reversal is appropriate only

when reasonable persons would not be able to form inferences as to each material element of the offense. *Id*.

[18] Pursuant to Indiana Code section 35-43-4-2(a), the State was required to prove that Nodine "knowingly or intentionally exert[ed] unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use[.]" Nodine contends that no evidence was presented that he operated Jenkins' vehicle, thus, he maintains that the State provided no evidence that he stole Jenkins' vehicle.

[19] The record shows that on the night Jenkins' vehicle was stolen, Nodine was one of the male occupants in the Dodge Durango that Officer Nawrocki stopped shortly before the theft. Further, the Wal-Mart surveillance cameras showed one of the male occupants exit the Dodge Durango, enter Jenkins' vehicle, and drive away with Jenkins' vehicle. In addition, a few days after Jenkins' vehicle was stolen, two men arrived at Tink's auto repair shop and one of the men who identified himself as Jake, pushed Jenkins' vehicle into Tink's auto shop driveway. Further, from a photo, Tink confirmed to Detective Heffelfinger that Nodine and Jake were one and the same person. Lastly, the DNA evidence confirmed that Nodine's DNA was inside Jenkins' vehicle. Based on all the evidence presented and reasonable inferences, we conclude that the State presented sufficient evidence beyond a reasonable doubt that Nodine knowingly or intentionally exerted unauthorized control over Jenkins' vehicle with the intent to deprive Jenkins of the value or use of his vehicle.

# CONCLUSION

Based on the foregoing, we conclude that the pre-trial identification of Nodine as the perpetrator was not impermissibly suggestive and the State presented sufficient evidence beyond a reasonable doubt to support Nodine's theft conviction.

Affirmed.

May, J. and Altice, J. concur