## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 18 2020, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas C. Allen
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tina L. Mann
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Quentin E. Stewart,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 18, 2020

Court of Appeals Case No.
20A-CR-230

Appeal from the
Allen Superior Court

The Honorable
Frances C. Gull, Judge

Trial Court Cause No.
02D05-1809-MR-17

**Kirsch, Judge.**

Following a jury trial, Quentin E. Stewart ("Stewart") was convicted of murder[1], a felony. Stewart appeals his murder conviction and raises one issue, which we restate as whether the State presented sufficient evidence to rebut his claim of self-defense.

We affirm.

## Facts and Procedural History

Zachary Bailey ("Bailey") and Codi McCann ("McCann") had known each other since childhood and were best friends. *Tr. Vol. 3* at 21. If Bailey was going through a hard time he would often live with McCann and considered McCann to be like a brother. *Id.* at 22. On December 6, 2016, Dorrion Jefferson ("Jefferson"), who was also known as City or City Boy, contacted Bailey to purchase a pound of marijuana. *Id.* at 23-24. Bailey and Jefferson communicated primarily through Snapchat and text messaging regarding the marijuana purchase. *Id.* at 23. Bailey knew Jefferson primarily as City Boy and had met with him on two previous occasions. *Id.* Jefferson told Bailey to meet him at the State Bar and Grill that night, and Bailey thought Jefferson was acting "pushy, he was real pushy" because Jefferson "was really trying to initiate [the marijuana purchase] more than me and it was kind of a red -- I should have known better, it was kind of a red flag." *Id.* at 25. Bailey asked McCann to come with him to meet Jefferson because of his concerns. *Id.*

---

[1] *See* Ind. Code § 35-42-1-1.

McCann went with Bailey and brought along a gun. *Id.* at 51-52. Before they met, Jefferson asked Bailey what kind of car Bailey drove and told Bailey where he should park the car, that Bailey should come into the bar as soon as he arrived, and to leave McCann and the pound of marijuana in the car. *Id.* at 25-26. Bailey thought the situation was "completely rehearsed" and that Jefferson was "dictating" the terms but proceeded to meet with Jefferson according to Jefferson's instructions. *Id.* Bailey, who had been driving, left McCann in the passenger seat and went into the bar to meet Jefferson. *Id.* at 26-27, 36; *State's Ex.* 9 at 21:47:42.

[4] While Bailey and Jefferson were in the bar talking, Adam Reinders ("Reinders") was in the outside smoking patio area of the bar talking to a friend when he noticed a Jeep Cherokee slowly circling the parking lot. *Tr. Vol. 3* at 10-11; *State's Exs.* 2, 9. Reinders observed the Jeep Cherokee circling the parking lot at least three times, which he thought was strange, and he then heard what he thought were fireworks but were later determined to be gun shots that seemed to be coming from down a nearby alley. *Tr. Vol. 3* at 9-10, 15; *State's Ex.* 9 at 21:48:46. Reinders went back into the bar after he heard the noises. *Tr. Vol. 3* at 12.

[5] Bailey and Jefferson then left the bar together after three to four minutes and walked to Bailey's car. *Tr. Vol. 3* at 28; *State's Ex.* 9 at 21:50:36. When Bailey entered the driver's side of the car, he noticed shards of glass in the vehicle and saw that McCann was unconscious and slumped over in the passenger seat, so Bailey shook McCann while calling his name. *Tr. Vol. 3* at 30. Jefferson did

not get into Bailey's car but looked through the shattered passenger side window and said "[w]hat the fuck, bro?" *Id.* at 31. Jefferson then left in a black Jeep Cherokee that he had borrowed from his girlfriend, telling Bailey "[d]on't say my fucking name." *Id.* at 29-30, 87, 89. Bailey noticed that the bag containing the pound of marijuana was gone from the car. *Id.* at 29. McCann's .40 caliber Smith & Wesson handgun was lying in his lap. *Id.* at 66.

[6] A call to 911 was made, and when the medics arrived, McCann was pronounced dead. *Tr. Vol. 2* at 211-12, 249-50; *Tr. Vol. 3* at 56. He died of a gunshot wound to his chest. *Tr. Vol. 2* at 224, 228. The type of chest wound McCann suffered would cause a person to lose consciousness within one to two minutes, and death likely would have occurred within five minutes after being shot. *Id.* at 230. McCann also had a second, non-fatal gunshot wound to the thigh. *Id.* at 224.

[7] Jefferson arrived home at some time between eleven and midnight. *Tr. Vol. 3* at 89-90. He came "through the door kind of frantically," stating that "[t]hings went bad, my friend got shot." *Id.* at 90. He told his girlfriend that he had hurt his ankle and told her to drive him to the hospital. *Id.* at 90-92. On their arrival at the hospital, police seized the black Jeep Cherokee. *Id.* at 92-93.

[8] On that same night, Stewart had his then-girlfriend, Haley McPherson ("McPherson"), drop him off near the bar. *Id.* at 77; *Def's. Ex.* D. McPherson heard gunshots about two minutes after she dropped Stewart off, and Stewart called her saying that he had been shot. *Id.* at 79-83. McPherson drove Stewart

to the hospital and did not notice whether Stewart had a gun on him. *Id.* at 81. Police arrived at the hospital, impounded McPherson's car, and found a .45 caliber Hi-Point semi-automatic weapon under the passenger seat. *Id.* at 95-97, 119. Stewart later told police during questioning that he had gone to the bar to meet a girl; he denied knowing a person named City, having a gun with him that evening, and that he had called McPherson to tell her he had been shot. *State's Ex.* 54 at 10:30:56; 10:34:04; 10:37:12; 10:39:15.

[9] DNA swab testing on the .45 caliber Hi-Point was conducted at the Indiana State Police Laboratory. The test showed that the DNA of Jefferson, McPherson, and Stewart were found on the weapon. *Tr. Vol. 3* at 145-47. The DNA testing showed that "the DNA profile, the evidence itself, is at least one trillion times more likely if it originated from Quentin Stewart and two unknown individuals than if it originated from three unknown individuals[,]" which "provides strong support for the proposition that Quentin Stewart is a contributor to the DNA profile" found on the weapon. *Id.* at 147. Ballistics testing at the Indiana State Police Laboratory was also performed on the two recovered firearms and the five casings and one bullet recovered at the scene. *Tr. Vol. 3* at 155. Of the five casings found at the scene, three were fired from the .40 caliber handgun, and two were fired by the .45 caliber Hi-Point. *Id.* at 156. The bullet was excluded from having been shot by the .40 caliber gun, but it could not be identified or excluded from being shot from the .45 caliber Hi-Point. *Id.* at 156-57. The SIM card in Stewart's phone contained a contact named "City" with a phone number that matched Jefferson's. *Id.* at 191.

However, police were unable to extract additional information from Stewart's phone because Stewart had set the phone to reset if someone else tried to turn it on. *Id.* at 176-77, 228.

[10] On September 17, 2018, Stewart was charged with murder and an enhancement for use of a firearm. *Appellant's App. Vol. 2* at 23-25. On September 12, 2019, Steward notified the State that he would be claiming the affirmative defense of justifiable force. *Id.* at 68. A jury trial was set for September 24, 2019, which was declared a mistrial as a result of a hung jury. *Id.* at 11-12.

[11] The trial court set another trial date for December 3, 2019. *Id.* at 14. At the second trial, Stewart's testimony from his prior trial, which was redacted in parts, was read into evidence. *Tr. Vol. 3* at 203-30; *Defendant's Ex.* D at 61-95. In that testimony, Stewart stated McPherson took him to the bar that night to sell heroin to Jefferson. *Tr. Vol. 3* at 204-05. His testimony was that he met Jefferson in the bar's parking lot, that both Bailey and McCann were also there, and that he did not know either Bailey or McCann. *Id.* at 206-09. He added that he did not have any drugs on him and that no drug transaction between him and Jefferson occurred. *Id.* at 210-11. His testimony was that Bailey asked him for heroin and cocaine and that McCann, who was in the car, "upped a gun" on him. *Id.* at 212. At that point, he stated that he attempted to block McCann's gun by hitting it on the barrel, that McCann fired a shot at him through the car's halfway up window, and that the shot hit him in the chest. *Id.* at 213. He stated that McCann shot him again in his lower stomach, and that after having been shot twice, he shot back. *Id.* at 214. Stewart said he went to

McPherson's car and told her he had been shot and that she took him to the hospital. *Id.* at 215. He also explained that he lied in his earlier statements to the police because he was angry, stating that he was upset with Detective Scott Tegtmeyer, McCann's mother, and news reports about the case. *Id.* at 216. He acknowledged that he knew and communicated with Jefferson, that he had a loaded gun with him that evening, and that he fired the shot that killed McCann. *Id.* at 219, 222, 228.

[12] On December 5, 2019, the jury returned a verdict of guilty to murder and also returned a verdict of guilty as charged to the firearm enhancement. *Id.* at 175. On January 3, 2020, the trial court sentenced Stewart to sixty years executed for murder with an enhancement of an additional ten years for the use of a firearm, for a total aggregate sentence of seventy years executed in the Indiana Department of Correction. *Id.* at 177-78. Stewart now appeals.

## Discussion and Decision

[13] Stewart contends that the State presented insufficient evidence to rebut his claim that he was acting in self-defense. The standard for reviewing a challenge to the sufficiency of evidence to rebut a self-defense claim is the same standard for a claim of insufficient evidence. *Ervin v. State*, 114 N.E.3d 888, 895 (Ind. Ct. App. 2018), *trans. denied*. We neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* We consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Id.* We will affirm a conviction if there is substantial evidence of probative value such that a

reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.* It is not necessary that evidence overcome every reasonable hypothesis of innocence. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). A conviction may be based upon circumstantial evidence alone. *Id.* at 134.

[14] Indiana's self-defense statute provides:

> A person: (1) is justified in using reasonable force, including deadly force, against any other person; and (2) does not have a duty to retreat; if the person reasonably believes that the force is necessary to prevent serious bodily injury to the person or a third person on the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

Ind. Code § 35-41-3-2(c). The statute also provides that "a person is not justified in using force if . . . the person is committing or is escaping after the commission of a crime[.]" Ind. Code § 35-41-3-2(g)(1). With respect to the limitation on the use self-defense set forth in Indiana Code section 35-41-3-2(g)(1), the Indiana Supreme Court has recently stated that:

> Although the self-defense statute instructs that a person cannot use force defending himself if he, among other things, "is committing . . . a crime," Ind. Code § 35-41-3-2, we do not strictly apply that statute because "[t]he legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result," *Mayes v. State*, 744 N.E.2d 390, 393 (Ind. 2001). Instead, we have held that "there must be an immediate **causal connection**

between the crime and the confrontation." *Id.* at 394 (emphasis added).

*Gammons v. State*, 148 N.E.3d 301, 304 (Ind. 2020).[2]

[15] To prevail on his self-defense claim, Stewart was required to show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Quinn v. State*, 126 N.E.3d 924, 927 (Ind. Ct. App. 2019). The State may meet its burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by relying on the sufficiency of the case-in chief. *Id.*

[16] Relying primarily on his testimony that was read into evidence at trial, Stewart contends that McCann shot first and that he shot back in self-defense to support his argument that the State failed to rebut his self-defense claim. He maintains that his testimony, coupled with the medical examiner's testimony that McCann would not have been able to return fire after having been shot in the chest, supports his position that he was acting in self-defense. The State

---

[2] *Gammons* involved a challenge to a trial court's jury instruction on self-defense "instructing that the crime and confrontation must merely be 'directly and immediately related,'" which "weakened the causal connection required to preclude a claim of self-defense." 148 N.E.3d at 304. The Court "reiterate[d] that self-defense is barred only when there is "an immediate causal connection between the crime and the confrontation." *Id.* at 305.

maintains that it sufficiently rebutted Stewart's claim of self-defense in its case-in-chief.

[17] Stewart's argument that the State failed to meet its burden is unavailing because it asks us to reweigh the evidence, which we cannot do. *See Ervin*, 114 N.E.3d at 895. The jury heard Stewart's recounting of the events that night that was read into evidence at trial and made the determination that it was not credible and did not assign it significant weight. It was able to weigh Stewart's testimony with the other evidence that was presented during the trial, including the testimony of the medical examiner. *See Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) ("It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction.").

[18] Viewing the evidence most favorably to the conviction shows that Stewart worked with Jefferson to commit a robbery. Bailey thought Jefferson was acting "pushy, he was real pushy" because Jefferson "was really trying to initiate [the marijuana purchase] more than me and it was kind of a red -- I should have known better, it was kind of a red flag." *Tr. Vol. 3* at 25. He described Jefferson's actions as "completely rehearsed" and that Jefferson was "dictating" the terms of the transaction. *Id.* McCann came with Bailey because of Bailey's concerns, and McCann brought his gun. *Id.* at 25-26, 51-52. Bailey followed Jefferson's instructions, including the where to park his car, to come into the bar as soon as he arrived, and to leave McCann and the pound of marijuana in the car. *Id.* at 25-26. Bailey left McCann in the passenger seat,

exited the vehicle, entered the bar, and discussed the marijuana purchase for about three or four minutes with Jefferson -- all according to Jefferson's instructions. *Id.* at 25-27, 36; *State's Ex.* 9 at 21:47:42, 21:50:36. In the meantime, McCann stayed in the car and Reinders, who was in the bar's outdoor patio area, reported hearing what were gunshots while Jefferson and Bailey were still inside the bar. *Tr. Vol. 3.* at 9-15, 26-27; *State's Ex.* 9 at 21:48:46. Approximately two minutes after McPherson dropped Stewart off near the bar, she heard gunshots, and Stewart called her saying that he had been shot. *Tr. Vol. 3* at 77-83. Stewart admitted that on that evening he brought a loaded gun with him to the bar and that he knew Jefferson and had communicated with him. *Id.* at 219, 222, 228. Although police were unable to extract additional information from Stewart's phone because he had set the phone to reset if someone else tried to turn it on, the SIM card in his phone also listed "City", which was Jefferson's nickname, as a contact. *Id.* at 176-77, 191, 228. Stewart responded affirmatively, when asked whether he fired the shots that killed McCann, stating "[y]es, sir." *Id.* at 228. The same gun used in the shooting of McCann was later found under the passenger seat of McPherson's car, precisely where Stewart had been sitting, and contained his DNA. *Id.* at 119, 148-51. While police did not recover any drugs during the search of the three vehicles, the bag containing the marijuana was not in the car when Bailey returned to the car. *Id.* at 29, 123, 197-98. Stewart also initially lied to police, stating he went to the bar to meet a girl, denied knowing Jefferson, denied having a gun with him that evening, and denied calling McPherson saying that he had been shot. *State's Ex. 54* at 10:30:56; 10:34:04; 10:37:12; 10:39:15. *See*

*Hughes v. State,* 546 N.E.2d 1203, 1208 (Ind.1989) (observing that testimony tending to show a defendant's attempt to conceal incriminating evidence or to manufacture exculpatory evidence may be considered by the jury as evidence of consciousness of guilt.). A reasonable jury could determine that the State's evidence showed that Stewart's actions in concert with Jefferson resulted in an "immediate causal connection" between the robbery and the eventual confrontation, which removes the justification for Stewart's use of force. *See Gammons*, 148 N.E.3d at 304; *Mayes*, 744 N.E.2d at 394. Therefore, the evidence was sufficient for a reasonable jury to determine that the State rebutted Stewart's self-defense claim.

[19] Affirmed.

Pyle, J., and Tavitas, J., concur.